## SCREWS ET AL. *v.* UNITED STATES.

No. 42.   Argued October 20, 1944.—Decided May 7, 1945.

*Mr. James F. Kemp,* with whom *Messrs. Clint W. Hager* and *Robert B. Short* were on the brief, for petitioners.

*Solicitor General Fahy,* with whom *Assistant Attorney General Tom C. Clark, Messrs. Robert S. Erdahl* and *Irving S. Shapiro* were on the brief, for the United States.

*Messrs. William H. Hastie, Thurgood Marshall* and *Leon A. Ransom* filed a brief on behalf of the National Association for the Advancement of Colored People, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS announced the judgment of the Court and delivered the following opinion, in which the CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE REED concur.

This case involves a shocking and revolting episode in law enforcement. Petitioner Screws was sheriff of Baker County, Georgia. He enlisted the assistance of petitioner Jones, a policeman, and petitioner Kelley, a special deputy, in arresting Robert Hall, a citizen of the United States and of Georgia. The arrest was made late at night at Hall's home on a warrant charging Hall with theft of a tire. Hall, a young negro about thirty years of age, was handcuffed and taken by car to the court house. As Hall alighted from the car at the court-house square, the three petitioners began beating him with their fists and with a solid-bar blackjack about eight inches long and weighing two pounds. They claimed Hall had reached for a gun and had used insulting language as he alighted from the

car. But after Hall, still handcuffed, had been knocked to the ground they continued to beat him from fifteen to thirty minutes until he was unconscious. Hall was then dragged feet first through the court-house yard into the jail and thrown upon the floor dying. An ambulance was called and Hall was removed to a hospital where he died within the hour and without regaining consciousness. There was evidence that Screws held a grudge against Hall and had threatened to "get" him.

An indictment was returned against petitioners—one count charging a violation of § 20 of the Criminal Code, 18 U. S. C. § 52 and another charging a conspiracy to violate § 20 contrary to § 37 of the Criminal Code, 18 U. S. C. § 88. Sec. 20 provides:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both."

The indictment charged that petitioners, acting under color of the laws of Georgia, "willfully" caused Hall to be deprived of "rights, privileges, or immunities secured or protected" to him by the Fourteenth Amendment—the right not to be deprived of life without due process of law; the right to be tried, upon the charge on which he was arrested, by due process of law and if found guilty to be punished in accordance with the laws of Georgia; that is to say that petitioners "unlawfully and wrongfully did assault, strike and beat the said Robert Hall about the head with human fists and a blackjack causing injuries" to Hall "which were the proximate and immediate cause

of his death." A like charge was made in the conspiracy count.

The case was tried to a jury.[1] The court charged the jury that due process of law gave one charged with a crime the right to be tried by a jury and sentenced by a court. On the question of intent it charged that

". . . if these defendants, without its being necessary to make the arrest effectual or necessary to their own personal protection, beat this man, assaulted him or killed him while he was under arrest, then they would be acting illegally under color of law, as stated by this statute, and would be depriving the prisoner of certain constitutional rights guaranteed to him by the Constitution of the United States and consented to by the State of Georgia."

The jury returned a verdict of guilty and a fine and imprisonment on each count was imposed. The Circuit Court of Appeals affirmed the judgment of conviction, one judge dissenting. 140 F. 2d 662. The case is here on a petition for a writ of certiorari which we granted because of the importance in the administration of the criminal laws of the questions presented.

I

We are met at the outset with the claim that § 20 is unconstitutional, insofar as it makes criminal acts in violation of the due process clause of the Fourteenth Amendment. The argument runs as follows: It is true that this Act as construed in *United States* v. *Classic,* 313 U. S. 299, 328, was upheld in its application to certain ballot box frauds committed by state officials. But in that case the constitutional rights protected were the rights to vote

---

[1] A demurrer to the indictment alleging among other things that the matters charged did not constitute an offense against the United States and did not come within the purview of § 20 was overruled. At the end of the government's case petitioners' motion for a directed verdict on the grounds of the insufficiency of the evidence was denied.

specifically guaranteed by Art. I, § 2 and § 4 of the Constitution. Here there is no ascertainable standard of guilt. There have been conflicting views in the Court as to the proper construction of the due process clause. The majority have quite consistently construed it in broad general terms. Thus it was stated in *Twining* v. *New Jersey,* 211 U. S. 78, 101, that due process requires that "no change in ancient procedure can be made which disregards those fundamental principles, to be ascertained from time to time by judicial action, which have relation to process of law and protect the citizen in his private right, and guard him against the arbitrary action of government." In *Snyder* v. *Massachusetts,* 291 U. S. 97, 105, it was said that due process prevents state action which "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." The same standard was expressed in *Palko* v. *Connecticut,* 302 U. S. 319, 325, in terms of a "scheme of ordered liberty." And the same idea was recently phrased as follows: "The phrase formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." *Betts* v. *Brady,* 316 U. S. 455, 462.

It is said that the Act must be read as if it contained those broad and fluid definitions of due process and that if it is so read it provides no ascertainable standard of guilt. It is pointed out that in *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 89, an Act of Congress was struck down, the enforcement of which would have been "the exact equivalent of an effort to carry out a statute

which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury." In that case the act declared criminal was the making of "any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries." 255 U. S. p. 86. The Act contained no definition of an "unjust or unreasonable rate" nor did it refer to any source where the measure of "unjust or unreasonable" could be ascertained. In the instant case the decisions of the courts are, to be sure, a source of reference for ascertaining the specific content of the concept of due process. But even so the Act would incorporate by reference a large body of changing and uncertain law. That law is not always reducible to specific rules, is expressible only in general terms, and turns many times on the facts of a particular case. Accordingly, it is argued that such a body of legal principles lacks the basic specificity necessary for criminal statutes under our system of government. Congress did not define what it desired to punish but referred the citizen to a comprehensive law library in order to ascertain what acts were prohibited. To enforce such a statute would be like sanctioning the practice of Caligula who "published the law, but it was written in a very small hand, and posted up in a corner, so that no one could make a copy of it." Suetonius, Lives of the Twelve Caesars, p. 278.

The serious character of that challenge to the constitutionality of the Act is emphasized if the customary standard of guilt for statutory crimes is taken. As we shall see, specific intent is at times required. Holmes, The Common Law, pp. 66 *et seq.* But the general rule was stated in *Ellis* v. *United States,* 206 U. S. 246, 257, as follows: "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." And see *Horning* v. *District of*

*Columbia,* 254 U. S. 135, 137; *Nash* v. *United States,* 229 U. S. 373, 377. Under that test a local law enforcement officer violates § 20 and commits a federal offense for which he can be sent to the penitentiary if he does an act which some court later holds deprives a person of due process of law. And he is a criminal though his motive was pure and though his purpose was unrelated to the disregard of any constitutional guarantee. The treacherous ground on which state officials—police, prosecutors, legislators, and judges—would walk is indicated by the character and closeness of decisions of this Court interpreting the due process clause of the Fourteenth Amendment. A confession obtained by too long questioning (*Ashcraft* v. *Tennessee,* 322 U. S. 143); the enforcement of an ordinance requiring a license for the distribution of religious literature (*Murdock* v. *Pennsylvania,* 319 U. S. 105); the denial of the assistance of counsel in certain types of cases (Cf. *Powell* v. *Alabama,* 287 U. S. 45 with *Betts* v. *Brady, supra*); the enforcement of certain types of anti-picketing statutes (*Thornhill* v. *Alabama,* 310 U. S. 88); the enforcement of state price control laws (*Olsen* v. *Nebraska,* 313 U. S. 236); the requirement that public school children salute the flag (*Board of Education* v. *Barnette,* 319 U. S. 624)—these are illustrative of the kind of state action [2] which might or might not be caught in the broad reaches of § 20 dependent on the prevailing view of the Court as constituted when the case arose. Those who enforced local law today might not know for many months (and meanwhile could not find out) whether what they did deprived some one of due process of law. The enforcement of a criminal statute so construed would indeed cast

---

[2] Moreover, federal as well as state officials would run afoul of the Act since it speaks of "any law, statute, ordinance, regulation, or custom." Comparable uncertainties will exist in the application of the due process clause of the Fifth Amendment.

law enforcement agencies loose at their own risk on a vast uncharted sea.

If such a construction is not necessary, it should be avoided. This Court has consistently favored that interpretation of legislation which supports its constitutionality. *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 348; *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 30; *Anniston Mfg. Co.* v. *Davis,* 301 U. S. 337, 351–352. That reason is impelling here so that if at all possible § 20 may be allowed to serve its great purpose— the protection of the individual in his civil liberties.

Sec. 20 was enacted to enforce the Fourteenth Amendment.[3] It derives[4] from § 2 of the Civil Rights Act of April 9, 1866. 14 Stat. 27.[5] Senator Trumbull, chairman of the Senate Judiciary Committee which reported the bill, stated that its purpose was "to protect all persons in the United States in their civil rights, and furnish the means of their vindication." Cong. Globe, 39th Cong., 1st Sess., p. 211. In origin it was an antidiscrimination measure (as its language indicated), framed to protect Negroes in their newly won rights. See Flack, The Adoption of the Fourteenth Amendment (1908), p. 21. It was

[3] See Cong. Globe, 41st Cong., 2d Sess., pp. 3807–3808, 3881. Flack, The Adoption of the Fourteenth Amendment (1908), pp. 19–54, 219, 223, 227; *Hague* v. *C. I. O.,* 307 U. S. 496, 510.

[4] See *United States* v. *Classic,* 313 U. S. 299, 327, note 10.

[5] "That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."

amended by § 17 of the Act of May 31, 1870, 16 Stat. 144,[6] and made applicable to "any inhabitant of any State or Territory."[7] The prohibition against the "deprivation of any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States" was introduced by the revisers in 1874. R. S. § 5510. Those words were taken over from § 1 of the Act of April 20, 1871, 17 Stat. 13 (the so-called Ku-Klux Act) which provided civil suits for redress of such wrongs.[8] See Cong. Rec.,

---

[6] "That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."
The preceding section referred to read as follows:
"That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void."

[7] Its sponsor, Senator Stewart, stated that "It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States." Cong. Globe, 41st Cong., 2d Sess., p. 1536.

[8] That section provided in part:
"That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be

43d Cong., 1st Sess., p. 828. The 1874 revision was applicable to any person who under color of law, etc., "subjects, or causes to be subjected" any inhabitant to the deprivation of any rights, etc. The requirement for a "willful" violation was introduced by the draftsmen of the Criminal Code of 1909. Act of March 4, 1909, 35 Stat. 1092. And we are told "willfully" was added to § 20 in order to make the section "less severe." 43 Cong. Rec., 60th Cong., 2d Sess., p. 3599.

We hesitate to say that when Congress sought to enforce the Fourteenth Amendment[9] in this fashion it did a vain thing. We hesitate to conclude that for 80 years this effort of Congress, renewed several times, to protect the important rights of the individual guaranteed by the Fourteenth Amendment has been an idle gesture. Yet if the Act falls by reason of vagueness so far as due process of law is concerned, there would seem to be a similar lack of specificity when the privileges and immunities clause (*Madden* v. *Kentucky*, 309 U. S. 83) and the equal protection clause (*Smith* v. *Texas,* 311 U. S. 128; *Hill* v. *Texas,* 316 U. S. 400) of the Fourteenth Amendment are involved. Only if no construction can save the Act from this claim of unconstitutionality are we willing to reach that result. We do not reach it, for we are of the view that if § 20 is confined more narrowly than the lower courts confined it, it can be preserved as one of the sanctions to the great rights which the Fourteenth Amendment was designed to secure.

---

subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . ."

This section became § 1979 of the Revised Statutes and is now found in 8 U. S. C. § 43. See *Hague* v. *C. I. O., supra,* note 3, p. 510.

[9] Sec. 5 thereof provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this Article."

## II

We recently pointed out that "willful" is a word "of many meanings, its construction often being influenced by its context." *Spies* v. *United States,* 317 U. S. 492, 497. At times, as the Court held in *United States* v. *Murdock,* 290 U. S. 389, 394, the word denotes an act which is intentional rather than accidental. And see *United States* v. *Illinois Central R. Co.,* 303 U. S. 239. But "when used in a criminal statute it generally means an act done with a bad purpose." *Id.,* p. 394. And see *Felton* v. *United States,* 96 U. S. 699; *Potter* v. *United States,* 155 U. S. 438; *Spurr* v. *United States,* 174 U. S. 728; *Hargrove* v. *United States,* 67 F. 2d 820. In that event something more is required than the doing of the act proscribed by the statute. Cf. *United States* v. *Balint,* 258 U. S. 250. An evil motive to accomplish that which the statute condemns becomes a constituent element of the crime. *Spurr* v. *United States, supra,* p. 734; *United States* v. *Murdock, supra,* p. 395. And that issue must be submitted to the jury under appropriate instructions. *United States* v. *Ragen,* 314 U. S. 513, 524.

An analysis of the cases in which "willfully" has been held to connote more than an act which is voluntary or intentional would not prove helpful as each turns on its own peculiar facts. Those cases, however, make clear that if we construe "willfully" in § 20 as connoting a purpose to deprive a person of a specific constitutional right, we would introduce no innovation. The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning.

See *United States* v. *Cohen Grocery Co., supra.* But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware. That was pointed out by Mr. Justice Brandeis speaking for the Court in *Omaechevarria* v. *Idaho,* 246 U. S. 343. An Idaho statute made it a misdemeanor to graze sheep "upon any range usually occupied by any cattle grower." The argument was that the statute was void for indefiniteness because it failed to provide for the ascertainment of boundaries of a "range" or for determining what length of time was necessary to make a prior occupation a "usual" one. The Court ruled that "any danger to sheepmen which might otherwise arise from indefiniteness, is removed by § 6314 of Revised Codes, which provides that: 'In every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence.'" *Id.,* p. 348. A similar ruling was made in *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497. The charge was that a criminal statute which regulated the sale of "kosher" meat or products "sanctioned by the orthodox Hebrew religious requirements" was unconstitutional for want of any ascertainable standard of guilt. The Court speaking through Mr. Justice Sutherland stated, ". . . since the statutes require a specific intent to defraud in order to encounter their prohibitions, the hazard of prosecution which appellants fear loses whatever substantial foundation it might have in the absence of such a requirement." 266 U. S. pp. 502–503. In *United States* v. *Ragen, supra,* we took

that course in a prosecution for willful evasion of a federal income tax where it was alleged that the defendant had deducted more than "reasonable" allowances for salaries. By construing the statute to require proof of bad faith we avoided the serious question which the rule of *United States* v. *Cohen Grocery Co., supra,* might have presented. We think a like course is appropriate here.

Moreover, the history of § 20 affords some support for that narrower construction. As we have seen, the word "willfully" was not added to the Act until 1909. Prior to that time it may be that Congress intended that he who deprived a person of any right protected by the Constitution should be liable without more. That was the pattern of criminal legislation which has been sustained without any charge or proof of *scienter. Shevlin-Carpenter Co.* v. *Minnesota,* 218 U. S. 57; *United States* v. *Balint, supra.* And the present Act in its original form would have been susceptible of the same interpretation apart from the equal protection clause of the Fourteenth Amendment, where "purposeful discriminatory" action must be shown. *Snowden* v. *Hughes,* 321 U. S. 1, 8–9. But as we have seen, the word "willfully" was added to make the section "less severe." We think the inference is permissible that its severity was to be lessened by making it applicable only where the requisite bad purpose was present, thus requiring specific intent not only where discrimination is claimed but in other situations as well. We repeat that the presence of a bad purpose or evil intent alone may not be sufficient. We do say that a requirement of a specific intent to deprive a person of a federal right made definite by decision or other rule of law saves the Act from any charge of unconstitutionality on the grounds of vagueness.

Once the section is given that construction, we think that the claim that the section lacks an ascertainable standard of guilt must fail. The constitutional requirement that a criminal statute be definite serves a high func-

tion. It gives a person acting with reference to the statute fair warning that his conduct is within its prohibition. This requirement is met when a statute prohibits only "willful" acts in the sense we have explained. One who does act with such specific intent is aware that what he does is precisely that which the statute forbids. He is under no necessity of guessing whether the statute applies to him (see *Connally* v. *General Construction Co.,* 269 U. S. 385) for he either knows or acts in reckless disregard of its prohibition of the deprivation of a defined constitutional or other federal right. See *Gorin* v. *United States,* 312 U. S. 19, 27–28. Nor is such an act beyond the understanding and comprehension of juries summoned to pass on them. The Act would then not become a trap for law enforcement agencies acting in good faith. "A mind intent upon willful evasion is inconsistent with surprised innocence." *United States* v. *Ragen, supra,* p. 524.

It is said, however, that this construction of the Act will not save it from the infirmity of vagueness since neither a law enforcement official nor a trial judge can know with sufficient definiteness the range of rights that are constitutional. But that criticism is wide of the mark. For the specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them. Take the case of a local officer who persists in enforcing a type of ordinance which the Court has held invalid as violative of the guarantees of free speech or freedom of worship. Or a local official continues to select juries in a manner which flies in the teeth of decisions of the Court. If those acts are done willfully, how can the officer possibly claim that he had no fair warning that his acts were prohibited by the statute? He violates the statute not merely because he has a bad purpose but because he acts in defiance of announced rules of law. He who defies a

decision interpreting the Constitution knows precisely what he is doing. If sane, he hardly may be heard to say that he knew not what he did. Of course, willful conduct cannot make definite that which is undefined. But willful violators of constitutional requirements, which have been defined, certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. When they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite. When they are convicted for so acting, they are not punished for violating an unknowable something.

The Act so construed has a narrower range in all its applications than if it were interpreted in the manner urged by the government. But the only other alternative, if we are to avoid grave constitutional questions, is to construe it as applicable only to those acts which are clearly marked by the specific provisions of the Constitution as deprivations of constitutional rights, privileges, or immunities, and which are knowingly done within the rule of *Ellis* v. *United States, supra.* But as we have said, that course would mean that all protection for violations of due process of law would drop out of the Act. We take the course which makes it possible to preserve the entire Act and save all parts of it from constitutional challenge. If Congress desires to give the Act wider scope, it may find ways of doing so. Moreover, here as in *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, we are dealing with a situation where the interpretation of the Act which we adopt does not preclude any state from punishing any act made criminal by its own laws. Indeed, the narrow construction which we have adopted more nearly preserves the traditional balance between the States and the national government in law enforcement than that which is urged upon us.

106

*United States* v. *Classic, supra,* met the test we suggest. In that case we were dealing merely with the validity of an indictment, not with instructions to the jury. The indictment was sufficient since it charged a willful failure and refusal of the defendant election officials to count the votes cast, by their alteration of the ballots and by their false certification of the number of votes cast for the respective candidates. 313 U. S. pp. 308–309. The right so to vote is guaranteed by Art. I, § 2 and § 4 of the Constitution. Such a charge is adequate since he who alters ballots or without legal justification destroys them would be acting willfully in the sense in which § 20 uses the term. The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution. When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees. Likewise, it is plain that basic to the concept of due process of law in a criminal case is a trial—a trial in a court of law, not a "trial by ordeal." *Brown* v. *Mississippi,* 297 U. S. 278, 285. It could hardly be doubted that they who "under color of any law, statute, ordinance, regulation, or custom" act with that evil motive violate § 20. Those who decide to take the law into their own hands and act as prosecutor, jury, judge, and executioner plainly act to deprive a prisoner of the trial which due process of law guarantees him. And such a purpose need not be expressed; it may at times be reasonably inferred from all the circumstances attendant on the act. See *Tot* v. *United States,* 319 U. S. 463.

The difficulty here is that this question of intent was not submitted to the jury with the proper instructions. The court charged that petitioners acted illegally if they applied more force than was necessary to make the arrest effectual or to protect themselves from the prisoner's al-

leged assault. But in view of our construction of the word "willfully" the jury should have been further instructed that it was not sufficient that petitioners had a generally bad purpose. To convict it was necessary for them to find that petitioners had the purpose to deprive the prisoner of a constitutional right, e. g. the right to be tried by a court rather than by ordeal. And in determining whether that requisite bad purpose was present the jury would be entitled to consider all the attendant circumstances—the malice of petitioners, the weapons used in the assault, its character and duration, the provocation, if any, and the like.

It is true that no exception was taken to the trial court's charge. Normally we would under those circumstances not take note of the error. See *Johnson* v. *United States,* 318 U. S. 189, 200. But there are exceptions to that rule. *United States* v. *Atkinson,* 297 U. S. 157, 160; *Clyatt* v. *United States,* 197 U. S. 207, 221–222. And where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion. Even those guilty of the most heinous offenses are entitled to a fair trial. Whatever the degree of guilt, those charged with a federal crime are entitled to be tried by the standards of guilt which Congress has prescribed.

### III

It is said, however, that petitioners did not act "under color of any law" within the meaning of § 20 of the Criminal Code. We disagree. We are of the view that petitioners acted under "color" of law in making the arrest of Robert Hall and in assaulting him. They were officers of the law who made the arrest. By their own admissions they assaulted Hall in order to protect themselves and to keep their prisoner from escaping. It was their duty

under Georgia law to make the arrest effective. Hence, their conduct comes within the statute.

Some of the arguments which have been advanced in support of the contrary conclusion suggest that the question under § 20 is whether Congress has made it a federal offense for a state officer to violate the law of his State. But there is no warrant for treating the question in state law terms. The problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under "color of any law." He who acts under "color" of law may be a federal officer or a state officer. He may act under "color" of federal law or of state law. The statute does not come into play merely because the federal law or the state law under which the officer purports to act is violated. It is applicable when and only when someone is deprived of a federal right by that action. The fact that it is also a violation of state law does not make it any the less a federal offense punishable as such. Nor does its punishment by federal authority encroach on state authority or relieve the state from its responsibility for punishing state offenses.[10]

We agree that when this statute is applied to the action of state officials, it should be construed so as to respect the proper balance between the States and the federal government in law enforcement. Violation of local law does not necessarily mean that federal rights have been invaded. The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the

---

[10] The petitioners may be guilty of manslaughter or murder under Georgia law and at the same time liable for the federal offense proscribed by § 20. The instances where "an act denounced as a crime by both national and state sovereignties" may be punished by each without violation of the double jeopardy provision of the Fifth Amendment are common. *United States* v. *Lanza,* 260 U. S. 377, 382; *Hebert* v. *Louisiana,* 272 U. S. 312.

Constitution or laws of the United States. Cf. *Logan* v. *United States*, 144 U. S. 263, dealing with assaults by federal officials. The Fourteenth Amendment did not alter the basic relations between the States and the national government. *United States* v. *Harris*, 106 U. S. 629; *In re Kemmler*, 136 U. S. 436, 448. Our national government is one of delegated powers alone. Under our federal system the administration of criminal justice rests with the States except as Congress, acting within the scope of those delegated powers, has created offenses against the United States. *Jerome* v. *United States*, 318 U. S. 101, 105. As stated in *United States* v. *Cruikshank*, 92 U. S. 542, 553–554, "It is no more the duty or within the power of the United States to punish for a conspiracy to falsely imprison or murder within a State, than it would be to punish for false imprisonment or murder itself." And see *United States* v. *Fox*, 95 U. S. 670, 672. It is only state action of a "particular character" that is prohibited by the Fourteenth Amendment and against which the Amendment authorizes Congress to afford relief. *Civil Rights Cases*, 109 U. S. 3, 11, 13. Thus Congress in § 20 of the Criminal Code did not undertake to make all torts of state officials federal crimes. It brought within § 20 only specified acts done "under color" of law and then only those acts which deprived a person of some right secured by the Constitution or laws of the United States.

This section was before us in *United States* v. *Classic*, 313 U. S. 299, 326, where we said: "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." In that case state election officials were charged with failure to count the votes as cast, alteration of the ballots, and false certification of the number of votes cast for the respective candidates. 313 U. S. pp. 308–309. We stated that those acts of the defendants "were committed in the course of

their performance of duties under the Louisiana statute requiring them to count the ballots, to record the result of the count, and to certify the result of the election." *Id.,* pp. 325–326. In the present case, as we have said, the defendants were officers of the law who had made an arrest and who by their own admissions made the assault in order to protect themselves and to keep the prisoner from escaping, i. e., to make the arrest effective. That was a duty they had under Georgia law. *United States v. Classic* is, therefore, indistinguishable from this case so far as "under color of" state law is concerned. In each officers of the State were performing official duties; in each the power which they were authorized to exercise was misused. We cannot draw a distinction between them unless we are to say that § 20 is not applicable to police officers. But the broad sweep of its language leaves no room for such an exception.

It is said that we should abandon the holding of the *Classic* case. It is suggested that the present problem was not clearly in focus in that case and that its holding was ill-advised. A reading of the opinion makes plain that the question was squarely involved and squarely met. It followed the rule announced in *Ex parte Virginia,* 100 U. S. 339, 346, that a state judge who in violation of state law discriminated against negroes in the selection of juries violated the Act of March 1, 1875, 18 Stat. 336. It is true that that statute did not contain the words under "color" of law. But the Court in deciding what was state action within the meaning of the Fourteenth Amendment held that it was immaterial that the state officer exceeded the limits of his authority. ". . . as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or to evade it." 100 U. S. at p. 347. And see *Virginia* v. *Rives,*

100 U. S. 313, 321. The *Classic* case recognized, without dissent, that the contrary view would defeat the great purpose which § 20 was designed to serve. Reference is made to statements [11] of Senator Trumbull in his discussion of § 2 of the Civil Rights Act of 1866, 14 Stat. 27, and to statements of Senator Sherman concerning the 1870 Act [12] as supporting the conclusion that "under color of any law" was designed to include only action taken by officials pursuant to state law. But those statements in their context are inconclusive on the precise problem involved in the *Classic* case and in the present case. We are not dealing here with a case where an officer not authorized to act nevertheless takes action. Here the state officers were authorized to make an arrest and to take such steps as were necessary to make the arrest effective. They acted without authority only in the sense that they used excessive force in making the arrest effective. It is clear that under "color" of law means under "pretense" of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it. If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words "under color of any law" were hardly apt words to express the idea.

Nor are the decisions under § 33 of the Judicial Code, 28 U. S. C. § 76, in point. That section gives the right of removal to a federal court of any criminal prosecution begun in a state court against a revenue officer of the United States "on account of any act done under color of his office or of any such (revenue) law." The cases under it recognize that it is an "exceptional" procedure which wrests from state courts the power to try offenses against

---

[11] Cong. Globe, 39th Cong., 1st Sess., p. 1759.
[12] Cong. Globe, 41st Cong., 2d Sess., p. 3663.

their own laws. *Maryland* v. *Soper* (*No. 1*), 270 U. S. 9, 29, 35; *Colorado* v. *Symes*, 286 U. S. 510, 518. Thus the requirements of the showing necessary for removal are strict. See *Maryland* v. *Soper* (*No. 2*), 270 U. S. 36, 42, saying that acts "necessary to make the enforcement effective" are done under "color" of law. Hence those cases do not supply an authoritative guide to the problems under § 20 which seeks to afford protection against officers who possess authority to act and who exercise their powers in such a way as to deprive a person of rights secured to him by the Constitution or laws of the United States. It is one thing to deprive state courts of their authority to enforce their own laws. It is quite another to emasculate an Act of Congress designed to secure individuals their constitutional rights by finely spun distinctions concerning the precise scope of the authority of officers of the law. Cf. *Yick Wo* v. *Hopkins*, 118 U. S. 356.

But beyond that is the problem of *stare decisis*. The construction given § 20 in the *Classic* case formulated a rule of law which has become the basis of federal enforcement in this important field. The rule adopted in that case was formulated after mature consideration. It should be good for more than one day only. We do not have here a situation comparable to *Mahnich* v. *Southern S. S. Co.*, 321 U. S. 96, where we overruled a decision demonstrated to be a sport in the law and inconsistent with what preceded and what followed. The *Classic* case was not the product of hasty action or inadvertence. It was not out of line with the cases which preceded. It was designed to fashion the governing rule of law in this important field. We are not dealing with constitutional interpretations which throughout the history of the Court have wisely remained flexible and subject to frequent reexamination. The meaning which the *Classic* case gave to the phrase "under color of any law" involved only a construction of the statute. Hence if it states a rule un-

desirable in its consequences, Congress can change it. We add only to the instability and uncertainty of the law if we revise the meaning of § 20 to meet the exigencies of each case coming before us.

Since there must be a new trial, the judgment below is

*Reversed.*

MR. JUSTICE RUTLEDGE, concurring in the result.

For the compelling reason stated at the end of this opinion I concur in reversing the judgment and remanding the cause for further proceedings. But for that reason, my views would require that my vote be cast to affirm the judgment, for the reasons stated by MR. JUSTICE MURPHY and others I feel forced, in the peculiar situation, to state.

The case comes here established in fact as a gross abuse of authority by state officers. Entrusted with the state's power and using it, without a warrant or with one of only doubtful legality [1] they invaded a citizen's home, arrested him for alleged theft of a tire, forcibly took him in handcuffs to the courthouse yard, and there beat him to death. Previously they had threatened to kill him, fortified themselves at a near-by bar, and resisted the bartender's importunities not to carry out the arrest. Upon this and other evidence which overwhelmingly supports (140 F. 2d at 665) the verdict, together with instructions adequately

---

[1] The evidence was conflicting whether the warrant was made out and issued before, or after, the arrest and killing, and if issued beforehand, whether it was valid. The Court of Appeals noted there was evidence "that the alleged warrant of arrest was prepared by the sheriff and was a spurious afterthought" (140 F. 2d at 665), but assumed in the petitioner's favor that a valid warrant had been issued. The dissenting opinion said the victim's shotgun was taken from his home "not in a search of his person but apparently without lawful warrant." 140 F. 2d at 667.

covering an officer's right to use force, the jury found the petitioners guilty.

I

The verdict has shaped their position here. Their contention hardly disputes the facts on which it rests.[2] They do not come therefore as faithful state officers, innocent of crime. Justification has been foreclosed. Accordingly, their argument now admits the offense, but insists it was against the state alone, not the nation. So they have made their case in this Court.[3]

In effect, the position urges it is murder they have done,[4] not deprivation of constitutional right. Strange as the argument is the reason. It comes to this, that abuse of state power creates immunity to federal power. Because what they did violated the state's laws, the nation cannot reach their conduct.[5] It may deprive the citizen of his liberty and his life. But whatever state officers may do in abuse of their official capacity can give this Government and its courts no concern. This, though the prime object of the Fourteenth Amendment and § 20 was to secure these fundamental rights against wrongful denial by exercise of the power of the states.

The defense is not pretty. Nor is it valid. By a long course of decision from *Ex parte Virginia,* 100 U. S. 339, to *United States* v. *Classic,* 313 U. S. 299, it has been re-

---

[2] The crucial dispute of fact was over whether the defendants had used more force than was necessary to restrain the prisoner. The "overwhelming weight of the testimony" (140 F. 2d at 665) was that they used not only all force required to subdue him (if it is assumed he resisted), but continued to beat him for fifteen to thirty minutes after he was knocked to the ground.

[3] Cf. Part II *infra.*

[4] The dissenting judge in the Court of Appeals thought the local offense was not "wilful murder, but rather that it was involuntary manslaughter in the commission of an unlawful act." 140 F. 2d at 666.

[5] It does not appear that the state has taken any steps toward prosecution for violation of its law.

jected.[6]  The ground should not need ploughing again. It was cleared long ago and thoroughly.  It has been kept clear, until the ancient doubt, laid in the beginning, was resurrected in the last stage of this case.  The evidence has nullified any pretense that petitioners acted as individuals, about their personal though nefarious business. They used the power of official place in all that was done. The verdict has foreclosed semblance of any claim that only private matters, not touching official functions, were involved.  Yet neither was the state's power, they say.

There is no third category.  The Amendment and the legislation were not aimed at rightful state action.  Abuse of state power was the target.  Limits were put to state authority, and states were forbidden to pass them, by whatever agency.[7]  It is too late now, if there were better reason than exists for doing so, to question that in these matters abuse binds the state and is its act, when done by

---

[6] Cf. notes 7 and 10.  And see *Neal v. Delaware*, 103 U. S. 370, 397; *Civil Rights Cases*, 109 U. S. 3, 15–18; *Chicago, B. & Q. R. Co. v. Chicago*, 166 U. S. 226, 233–234; *Raymond v. Chicago Traction Co.*, 207 U. S. 20, 35–37; *Ex parte Young*, 209 U. S. 123; *Home Tel. & Tel. Co. v. Los Angeles*, 227 U. S. 278, 288–289; *Cuyahoga Power Co. v. Akron*, 240 U. S. 462; *Fidelity & Deposit Co. v. Tafoya*, 270 U. S. 426, 434; *Hopkins v. Southern California Telephone Co.*, 275 U. S. 393, 398; *Iowa-Des Moines Bank v. Bennett*, 284 U. S. 239, 245–246; *Nixon v. Condon*, 286 U. S. 73, 89; *Mosher v. City of Phoenix*, 287 U. S. 29; *Sterling v. Constantin*, 287 U. S. 378, 393; *Mooney v. Holohan*, 294 U. S. 103; *Missouri ex rel. Gaines v. Canada*, 305 U. S. 337, 343; *Hague v. C. I. O.*, 307 U. S. 496, 512; *Cochran v. Kansas*, 316 U. S. 255; *Pyle v. Kansas*, 317 U. S. 213.

[7] "The prohibitions of the Fourteenth Amendment are directed to the States, . . . It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial. . . . Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.  This must be so,

one to whom it has given power to make the abuse effective to achieve the forbidden ends. Vague ideas of dual federalism,[8] of ultra vires doctrine imported from private agency,[9] and of want of finality in official action,[10] do not nullify what four years of civil strife secured and eighty years have verified. For it was abuse of basic civil and political rights, by states and their officials, that the Amendment and the enforcing legislation were adopted to uproot.

The danger was not merely legislative or judicial. Nor was it threatened only from the state's highest officials. It was abuse by whatever agency the state might invest with its power capable of inflicting the deprivation. In all its flux, time makes some things axiomatic. One has been that state officials who violate their oaths of office and flout

or the constitutional prohibition has no meaning." *Ex parte Virginia*, 100 U. S. 339, 346–347.

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States* v. *Classic*, 313 U. S. 299, 326, citing *Ex parte Virginia, supra*, and other authorities.

[8] Cf. Part III *infra*. "Such enforcement [of the Fourteenth Amendment by Congress] is no invasion of State sovereignty. No law can be, which the people of the States have, by the Constitution of the United States, empowered Congress to enact. This extent of the powers of the general government is overlooked, when it is said, as it has been in this case, that the act of March 1, 1875, [18 Stat., part 3, 336] interferes with State rights." *Ex parte Virginia*, 100 U. S. at 346.

[9] Cf. *Home Tel. & Tel. Co.* v. *Los Angeles*, 227 U. S. 278, 287.

[10] Compare *Barney* v. *City of New York*, 193 U. S. 430, with *Home Tel. & Tel. Co.* v. *Los Angeles*, 227 U. S. 278, the latter suggesting that the former, "if it conflicted with the doctrine" of *Raymond* v. *Chicago Traction Co.*, 207 U. S. 20, and *Ex parte Young*, 209 U. S. 123, "is now so distinguished or qualified as not to be here authoritative or even persuasive." 227 U. S. at 294. See also *Snowden* v. *Hughes*, 321 U. S. 1, 13; Isseks, Jurisdiction of the Lower Federal Courts to Enjoin Unauthorized Action of State Officials, 40 Harv. L. Rev. 969, 972.

the fundamental law are answerable to it when their misconduct brings upon them the penalty it authorizes and Congress has provided.

There could be no clearer violation of the Amendment or the statute. No act could be more final or complete, to denude the victim of rights secured by the Amendment's very terms. Those rights so destroyed cannot be restored. Nor could the part played by the state's power in causing their destruction be lessened, though other organs were now to repudiate what was done. The state's law might thus be vindicated. If so, the vindication could only sustain, it could not detract from the federal power. Nor could it restore what the federal power shielded. Neither acquittal nor conviction, though affirmed by the state's highest court, could resurrect what the wrongful use of state power has annihilated. There was in this case abuse of state power, which for the Amendment's great purposes was state action, final in the last degree, depriving the victim of his liberty and his life without due process of law.

If the issues made by the parties themselves were allowed to govern, there would be no need to say more. At various stages petitioners have sought to show that they used no more force than was necessary, that there was no state action, and that the evidence was not sufficient to sustain the verdict and the judgment. These issues, in various formulations,[11] have comprehended their case. All have been resolved against them without error. This should end the matter.

---

[11] Petitioners' objections in law were stated most specifically in the demurrer to the indictment. These grounds also were incorporated in their motion for a directed verdict and their statement of grounds for appeal. The grounds for demurrer maintained that the facts alleged were not sufficient to constitute a federal offense, to fall within or violate the terms of any federal law or statute, or to confer jurisdiction upon the District or other federal court. One ground attacked the indictment for vagueness.

## II

But other and most important issues have been injected and made decisive to reverse the judgment. Petitioners have not denied that they acted "willfully" within the meaning of § 20 or that they intended to do the acts which took their victim's liberty and life. In the trial court they claimed justification. But they were unable to prove it. The verdict, on overwhelming evidence, has concluded against them their denial of bad purpose and reckless disregard of rights. This is necessarily implied in the finding that excessive force was used. No complaint was made of the charge in any of these respects and no request for additional charges concerning them was offered. Nor, in the application for certiorari or the briefs, have they raised questions of the requisite criminal intent or of unconstitutional vagueness in the statute's definition of the crime. However, these issues have been brought forward, so far as the record discloses, first by the dissenting opinion in the Court of Appeals, then by inquiry at the argument and in the disposition here.

The story would be too long, to trace in more than outline the history of § 20 and companion provisions, in particular § 19,[12] with which it must be considered on any suggestion of fatal ambiguity. But this history cannot be ignored, unless we would risk throwing overboard what the nation's greatest internal conflict created and eight

---

[12] Section 19 of the Criminal Code (18 U. S. C. § 51):

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen *in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States,* or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than $5,000 and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust

decades have confirmed, in protection of individual rights against impairment by the states.

Sections 19 and 20 are twin sections in all respects that concern any question of vagueness in defining the crimes. There are important differences. Section 19 strikes at conspiracies, § 20 at substantive offenses. The former protects "citizens," the latter "inhabitants." There are, however, no differences in the basic rights guarded. Each protects in a different way the rights and privileges secured to individuals by the Constitution. If one falls for vagueness in pointing to these, the other also must fall for the same reason. If one stands, so must both. It is not one statute therefore which we sustain or nullify. It is two.

The sections have stood for nearly eighty years. Nor has this been without attack for ambiguity. Together the two sections have repelled it. In 1915, one of this Court's greatest judges, speaking for it, summarily disposed of the suggestion that § 19 is invalid: "It is not open to question that this statute is constitutional . . . [It] dealt with Federal rights and with all Federal rights, and protected them in the lump . . ." *United States* v. *Mosley,* 238 U. S. 383, 386, 387. And in *United States* v. *Classic,* 313 U. S. 299, the Court with equal vigor reaffirmed the validity of both sections, against dissenting assault for fatal

---

created by the Constitution or laws of the United States." (Emphasis added.)

Section 20 (18 U. S. C. § 52) is as follows:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to *the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States,* or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000, or imprisoned not more than one year, or both." (Emphasis added.)

ambiguity in relation to the constitutional rights then in question. These more recent pronouncements but reaffirmed earlier and repeated ones. The history should not require retelling. But old and established freedoms vanish when history is forgotten.

Section 20 originated in the Civil Rights Act of 1866 (14 Stat. 27), § 19 in the Enforcement Act of 1870 (16 Stat. 141, § 6). Their great original purpose was to strike at discrimination, particularly against Negroes, the one securing civil, the other political rights. But they were not drawn so narrowly. From the beginning § 19 protected all "citizens," § 20 "inhabitants."

At first § 20 secured only rights enumerated in the Civil Rights Act. The first ten years brought it, through broadening changes, to substantially its present form. Only the word "willfully" has been added since then, a change of no materiality, for the statute implied it beforehand.[13]   35 Stat. 1092. The most important change of the first decade replaced the specific enumeration of the Civil Rights Act with the present broad language covering "the deprivation of any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States." R. S. § 5510. This inclusive designation brought § 20 into conformity with § 19's original coverage of "any right or privilege secured to him by the Constitution or laws of the United States." Since then, under these generic designations, the two have been literally identical in the scope of the rights they secure. The slight difference in wording cannot be one of substance.[14]

---

[13] Cf. note 32. President Johnson, vetoing another bill on July 16, 1866, stated that the penalties of the Civil Rights Act "are denounced against the person who willfully violates the law." Cong. Globe, 39th Cong., 1st Sess., 3839.

[14] For the history of these changes, see the authorities cited in the opinion of MR. JUSTICE DOUGLAS, particularly Flack, Adoption of the Fourteenth Amendment (1908).

Throughout a long and varied course of application the sections have remained unimpaired on the score of vagueness in the crimes they denounce. From 1874 to today they have repelled all attacks proposed to invalidate them. None has succeeded. If time and uniform decision can give stability to statutes, these have acquired it.

Section 20 has not been much used, in direct application, until recently. There were however a number of early decisions.[15] Of late the section has been applied more frequently, in considerable variety of situation, against varied and vigorous attack.[16] In *United States* v. *Classic*, 313 U. S. at 321, as has been stated, this Court gave it clear-cut sanction. The opinion expressly repudiated any idea that the section, or § 19, is vitiated by ambiguity. Moreover, this was done in terms which leave no room to say that the decision was not focused upon that question.[17] True, application to Fourteenth Amendment

---

[15] *United States* v. *Rhodes*, 27 Fed. Cas. 785, No. 16,151; *United States* v. *Jackson*, 26 Fed. Cas. 563, No. 15,459; *United States* v. *Buntin*, 10 F. 730; cf. *United States* v. *Stone*, 188 F. 836, a prosecution under § 37 of the Criminal Code for conspiracy to violate § 20; cf., also 197 F. 483; *United States* v. *Horton*, 26 Fed. Cas. 375, No. 15,392. The constitutionality of the statute was sustained in the Rhodes case in 1866, and in the Jackson case in 1874. It was likewise sustained in *In re Turner*, 24 Fed. Cas. 337, No. 14,247 (1867); *Smith* v. *Moody*, 26 Ind. 299 (1866).

[16] Cf. the authorities cited *infra* at note 25.

[17] Referring to § 20, the Court said: "The generality of the section, made applicable as it is to deprivations of any constitutional right, does not obscure its meaning or impair its force within the scope of its application, which is restricted by its terms to deprivations which are willfully inflicted by those acting under color of any law, statute and the like." 313 U. S. at 328.

Concerning § 19, also involved, the Court pointed to the decisions in *Ex parte Yarbrough*, 110 U. S. 651, and *United States* v. *Mosley*, 238 U. S. 383, cf. note 22, and commented: ". . . the Court found no uncertainty or ambiguity in the statutory language, obviously devised to protect the citizen 'in the free exercise or enjoyment of any

rights was reserved because the question was raised for the first time in the Government's brief filed here. 313 U. S. at 329. But the statute was sustained in application to a vast range of rights secured by the Constitution, apart from the reserved segment, as the opinion's language and the single reservation itself attest. The ruling, thus broad, could not have been inadvertent. For it was repeated concerning both sections, broadly, forcefully, and upon citation of long-established authority. And this was done in response to a vigorous dissent which made the most of the point of vagueness.[18] The point was flatly, and deliberately, rejected. The Court could not have been blinded by other issues to the import of this one.

The *Classic* decision thus cannot be put aside in this case. Nor can it be demonstrated that the rights secured by the Fourteenth Amendment are more numerous or more dubious than the aggregate encompassed by other

---

right or privilege secured to him by the Constitution,' and concerned itself with the question whether the right to participate in choosing a representative is so secured. Such is our function here." 313 U. S. at 321. The opinion stated further: "The suggestion that § 19 . . . is not sufficiently specific to be deemed applicable to primary elections, will hardly bear examination. Section 19 speaks neither of elections nor of primaries. In unambiguous language it protects 'any right or privilege secured by the Constitution,' a phrase which . . . extends to the right of the voter to have his vote counted . . . as well as to numerous other constitutional rights which are wholly unrelated to the choice of a representative in Congress," citing *United States* v. *Waddell*, 112 U. S. 76; *Logan* v. *United States*, 144 U. S. 263; *In re Quarles*, 158 U. S. 532; *Motes* v. *United States*, 178 U. S. 458; *Guinn* v. *United States*, 238 U. S. 347. Cf. note 18.

[18] The dissenting opinion did not urge that §§ 19 and 20 are wholly void for ambiguity, since it put to one side cases involving discrimination for race or color as "plainly outlawed by the Fourteenth Amendment," as to which it was said, "Since the constitutional mandate is plain, there is no reason why § 19 or § 20 should not be applicable." However it was thought "no such unambiguous mandate" had been given by the constitutional provisions relevant in the *Classic* case. 313 U. S. at 332.

constitutional provisions. Certainly "the equal protection of the laws," guaranteed by the Amendment, is not more vague and indefinite than many rights protected by other commands.[19] The same thing is true of "the privileges or immunities of citizens of the United States." The Fifth Amendment contains a due process clause as broad in its terms restricting national power as the Fourteenth is of state power.[20] If § 20 (with § 19) is valid in general coverage of other constitutional rights, it cannot be void in the less sweeping application to Fourteenth Amendment rights. If it is valid to assure the rights "plainly and directly" secured by other provisions, it is equally valid to protect those "plainly and directly" secured by the Fourteenth Amendment, including the expressly guaranteed rights not to be deprived of life, liberty or property without due process of law. If in fact there could be any difference among the various rights protected, in view of the history it would be that the section applies more clearly to Fourteenth Amendment rights than to others. Its phrases "are all phrases of large generalities. But they are not generalities of unillumined vagueness; they are generalities circumscribed by history and appropriate to the largeness of the problems of government with which they were concerned." *Malinski* v. *New York,* 324 U. S. 401, concurring opinion, p. 413.

Historically, the section's function and purpose have been to secure rights given by the Amendment. From the Amendment's adoption until 1874, it was Fourteenth Amendment legislation. Surely when in that year the section was expanded to include other rights these were

---

[19] Cf. note 18.

[20] Whether or not the two are coextensive in limitation of federal and state power, respectively, there is certainly a very broad correlation in coverage, and it hardly could be maintained that one is confined by more clear-cut boundaries than the other, although differences in meandering of the boundaries may exist.

not dropped out. By giving the citizen additional security in the exercise of his voting and other political rights, which was the section's effect, unless the *Classic* case falls, Congress did not take from him the protection it previously afforded (wholly apart from the prohibition of different penalties)[21] against deprivation of such rights on account of race, color or previous condition of servitude, or repeal the prior safeguard of civil rights.

To strike from the statute the rights secured by the Fourteenth Amendment, but at the same time to leave within its coverage the vast area bounded by other constitutional provisions, would contradict both reason and history. No logic but one which nullifies the historic foundations of the Amendment and the section could support such an emasculation. There should be no judicial hack work cutting out some of the great rights the Amendment secures but leaving in others. There can be none excising all protected by the Amendment, but leaving

---

[21] The Court's opinion in the *Classic* case treated this clause of § 20, cf. note 12, as entirely distinct from the preceding clauses, stating that "the qualification with respect to alienage, color and race, refers only to differences in punishment *and not to* deprivations of any rights or privileges secured by the Constitution," (emphasis added) as was thought to be evidenced by the grammatical structure of the section and "the necessities of the practical application of its provisions." 313 U. S. 326.

The "pains and penalties" provision is clearly one against discrimination. It does not follow that the qualification as to alienage, color and race does not also refer to the "deprivation of any rights or privileges" clause, though not in an exclusive sense. No authority for the contrary dictum was cited. History here would seem to outweigh doubtful grammar, since, as § 20 originally appeared in the Civil Rights Act, the qualification as to "color or race" (alienage was added later) seems clearly applicable to its entire prohibition. Although the section is not exclusively a discrimination statute, it would seem clearly, in the light of its history, to include discrimination for alienage, color or race among the prohibited modes of depriving persons of rights or privileges.

every other given by the Constitution intact under the statute's aegis.

All that has been said of § 20 applies with equal force to § 19. It had an earlier more litigious history, firmly establishing its validity.[22] It also has received recent ap-

[22] *Ex parte Yarbrough,* 110 U. S. 651 (1884); *United States* v. *Waddell,* 112 U. S. 76 (1884); *Logan* v. *United States,* 144 U. S. 263 (1892); *In re Quarles and Butler,* 158 U. S. 532 (1895); *Motes* v. *United States,* 178 U. S. 458 (1900); *United States* v. *Mosley,* 238 U. S. 383 (1915); *United States* v. *Morris,* 125 F. 322 (1903); *United States* v. *Lackey,* 99 F. 952 (1900), reversed on other grounds, 107 F. 114, cert. denied, 181 U. S. 621.

In *United States* v. *Mosley, supra,* as is noted in the text, the Court summarily disposed of the question of validity, stating that the section's constitutionality "is not open to question." 238 U. S. at 386. Cf. note 17. The Court was concerned with implied repeal, but stated: "But § 6 [the antecedent of § 19 in the Enforcement Act] being devoted, as we have said, to the protection *of all Federal rights* from conspiracies against them . . . Just as the Fourteenth Amendment . . . was adopted with a view to the protection of the colored race but has been found to be equally important in its application to the rights of all, § *6 had a general scope and used general words that have become the most important* . . . The section now begins with sweeping general words. Those words always were in the act, and the present form gives them a congressional interpretation. Even if that interpretation would not have been held correct in an indictment under § 6, which we are far from intimating, and if we cannot interpret the past by the present, we cannot allow the past so far to affect the present as to deprive citizens of the United States of the general protection which on its face § 19 most reasonably affords." 238 U. S. at 387–388. (Emphasis added.) The dissenting opinion of Mr. Justice Lamar raised no question of the section's validity. It maintained that Congress had not included or had removed protection of voting rights from the section, leaving only civil rights within its coverage. 238 U. S. at 390.

The cases holding that the Fourteenth Amendment and § 19 do not apply to infractions of constitutional rights involving no state action recognize and often affirm the section's applicability to wrongful action by state officials which infringes them: *United States* v. *Cruikshank,* 92 U. S. 542 (1876); *Hodges* v. *United States,* 203 U. S. 1 (1906); *United States* v. *Powell,* 212 U. S. 564 (1909), see also 151 F.

plication,[23] without question for ambiguity except in the *Classic* case, which nevertheless gave it equal sanction with its substantive counterpart.

Separately, and often together in application, §§ 19 and 20 have been woven into our fundamental and statutory law. They have place among our more permanent legal achievements. They have safeguarded many rights and privileges apart from political ones. Among those buttressed, either by direct application or through the general conspiracy statute, § 37 (18 U. S. C. § 88),[24] are the rights to a fair trial, including freedom from sham trials; to be free from arrest and detention by methods constitutionally forbidden and from extortion of property by such methods; from extortion of confessions; from mob action incited or shared by state officers; from failure to furnish police protection on proper occasion and demand; from interference with the free exercise of religion, freedom of the press, freedom of speech and assembly;[25] and

---

648; *Ex parte Riggins*, 134 F. 404 (1904), dismissed, 199 U. S. 547; *United States* v. *Sanges*, 48 F. 78 (1891), writ of error dismissed, 144 U. S. 310; *Powe* v. *United States*, 109 F. 2d 147 (1940), cert. denied, 309 U. S. 679. See also *United States* v. *Hall*, 26 Fed. Cas. 79, No. 15,282 (1871); *United States* v. *Mall*, 26 Fed. Cas. 1147, No. 15,712 (1871).

[23] Cf. the authorities cited in notes 22 and 25; *United States* v. *Saylor*, 322 U. S. 385.

[24] Sections 19 and 37 clearly overlap in condemning conspiracies to violate constitutional rights. The latter, apparently, has been more frequently used, at any rate recently, when civil rather than political rights are involved. It goes without saying that in these cases validity of the application of § 37, charging conspiracy to violate § 20, depends upon the latter's validity in application to infraction of the rights charged to have been infringed.

[25] Recent examples involving these and other rights are: *Culp* v. *United States*, 131 F. 2d 93; *Catlette* v. *United States*, 132 F. 2d 902; *United States* v. *Sutherland*, 37 F. Supp. 344; *United States* v. *Trierweiler*, 52 F. Supp. 4.

In the *Culp* case the court said: "That this section [§ 20] has not lost any of its vitality since it was originally enacted, is indicated

the necessary import of the decisions is that the right to be free from deprivation of life itself, without due process of law, that is, through abuse of state power by state officials, is as fully protected as other rights so secured.

So much experience cannot be swept aside, or its teaching annulled, without overthrowing a great, and a firmly established, constitutional tradition. Nor has the feared welter of uncertainty arisen. Defendants have attacked the sections, or their application, often and strenuously. Seldom has complaint been made that they are too vague and uncertain. Objections have centered principally about "state action," including "color of law" and failure by inaction to discharge official duty, cf. *Catlette* v. *United States*, 132 F. 2d 902, and about the strength of federal power to reach particular abuses.[26] More rarely they have touched other matters, such as the limiting effect of official privilege [27] and, in occasional instances, *mens rea*.[28]

---

by . . . *United States* v. *Classic* . . . It is our opinion that a state law enforcement officer who, under color of state law, willfully and without cause, arrests and imprisons an inhabitant of the United States for the purpose of extortion, deprives him of a right, privilege, and immunity secured and protected by the Constitution of the United States, and commits one of the offenses defined in § 52." 131 F. 2d at 98. Fourteenth Amendment rights were involved also in the *Catlette* case; and in *United States* v. *Trierweiler, supra,* the court said: "The congressional purpose, obviously, is to assure enjoyment of the rights of citizens defined by the Fourteenth Amendment, including the mandate that no state shall deprive any person of life, liberty, or property without due process of law . . ." 52 F. Supp. at 5.

*United States* v. *Buntin,* 10 F. 730, involved alleged discrimination for race in denying the right to attend public school. In *United States* v. *Chaplin,* 54 F. Supp. 926, the court ruled that a state judge, acting in his judicial capacity, is immune to prosecution under § 37 for violating § 20. But cf. *Ex parte Virginia,* 100 U. S. 339.

[26] These have been the perennial objections, notwithstanding uniform rejection in cases involving interference with both political and civil rights. Cf. the authorities cited in notes 7, 10, 22 and 25.

[27] Compare *United States* v. *Chaplin,* 54 F. Supp. 926 (see note 25 supra), with *Ex parte Virginia,* 100 U. S. 339.

[28] Cf. *United States* v. *Buntin,* 10 F. 730.

In all this wealth of attack accused officials have little used the shield of ambiguity. The omission, like the Court's rejection in the *Classic* case, cannot have been inadvertent. There are valid reasons for it, apart from the old teaching that the matter has been foreclosed.

One is that the generality of the section's terms simply has not worked out to be a hazard of unconstitutional, or even serious, proportions. It has not proved a source of practical difficulty. In no other way can be explained the paucity of the objection's appearance in the wealth of others made. If experience is the life of the law, as has been said, this has been true preeminently in the application of §§ 19 and 20.

Moreover, statutory specificity has two purposes, to give due notice that an act has been made criminal before it is done and to inform one accused of the nature of the offense charged, so that he may adequately prepare and make his defense. More than this certainly the Constitution does not require. Cf. Amend. VI. All difficulty on the latter score vanishes, under § 20, with the indictment's particularization of the rights infringed and the acts infringing them. If it is not sufficient in either respect, in these as in other cases the motion to quash or one for a bill of particulars is at the defendant's disposal. The decided cases demonstrate that accused persons have had little or no difficulty to ascertain the rights they have been charged with transgressing or the acts of transgression.[29] So it was with the defendants in this case. They were not puzzled to know for what they were indicted, as their proof and their defense upon the law conclusively show. They simply misconceived that the victim had no federal rights and that what they had done was not a crime within the federal power to penalize.[30] That kind of error relieves no one from penalty.

[29] Cf. authorities cited in notes 7, 10, 22 and 25.
[30] Cf. Part III.

In the other aspect of specificity, two answers, apart from experience, suffice. One is that § 20, and § 19, are no more general and vague, Fourteenth Amendment rights included, than other criminal statutes commonly enforced against this objection. The Sherman Act is the most obvious illustration.[31]

Furthermore, the argument of vagueness, to warn men of their conduct, ignores the nature of the criminal act itself and the notice necessarily given from this. Section 20 strikes only at abuse of official functions by state officers. It does not reach out for crimes done by men in general. Not murder per se, but murder by state officers in the course of official conduct and done with the aid of state power, is outlawed. These facts, inherent in the crime, give all the warning constitutionally required. For one, so situated, who goes so far in misconduct can have no excuse of innocence or ignorance.

Generally state officials know something of the individual's basic legal rights. If they do not, they should, for they assume that duty when they assume their office. Ignorance of the law is no excuse for men in general. It is less an excuse for men whose special duty is to apply it, and therefore to know and observe it. If their knowledge is not comprehensive, state officials know or should know when they pass the limits of their authority, so far at any rate that their action exceeds honest error of judgment and amounts to abuse of their office and its function. When they enter such a domain in dealing with the citizen's rights, they should do so at their peril, whether that

---

[31] Compare the statutes upheld in *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 573–574; *Gorin* v. *United States*, 312 U. S. 19, 23–28; *Minnesota* v. *Probate Court*, 309 U. S. 270, 274; *Old Dearborn Co.* v. *Seagram Corp.*, 299 U. S. 183, 196; *Bandini Petroleum Co.* v. *Superior Court*, 284 U. S. 8, 18; *Whitney* v. *California*, 274 U. S. 357, 360, 368–369; *Fox* v. *Washington*, 236 U. S. 273, 277–278; *United States* v. *Keitel*, 211 U. S. 370, 393–395.

be created by state or federal law. For their sworn oath and their first duty are to uphold the Constitution, then only the law of the state which too is bound by the charter. Since the statute, as I think, condemns only something more than error of judgment, made in honest effort at once to apply and to follow the law, cf. *United States* v. *Murdock*, 290 U. S. 389, officials who violate it must act in intentional or reckless disregard of individual rights and cannot be ignorant that they do great wrong.[32]   This being true, they must be taken to act at peril of incurring the penalty placed upon such conduct by the federal law, as they do of that the state imposes.

What has been said supplies all the case requires to be decided on the question of criminal intent. If the criminal act is limited, as I think it must be and the statute intends, to infraction of constitutional rights, including rights secured by the Fourteenth Amendment, by conduct which amounts to abuse of one's official place or reckless disregard of duty, no undue hazard or burden can be placed on state officials honestly seeking to perform the rightful functions of their office. Others are not entitled to greater protection.

But, it is said, a penumbra of rights may  be involved, which none can know until decision has been made and infraction may occur before it is had. It seems doubtful this could be true in any case involving the abuse of official function which the statute requires and, if it could, that one guilty of such an abuse should have immunity for that reason. Furthermore, the doubtful character of the

[32] I think all this would be implied if "willfully" had not been added to § 20 by amendment. The addition but reinforces the original purpose. Cf. note 13 *supra*. Congress, in this legislation, hardly can be taken to have sought to punish merely negligent conduct or honest error of judgment by state officials. The aim was at grosser violations of basic rights and the supreme law. Sensible construction of the language, with other considerations, requires this view. The consistent course of the section's application supports it.

right infringed could give reason at the most to invalidate the particular charge, not for outlawing the statute or narrowly restricting its application in advance of compelling occasion.

For there is a body of well-established, clear-cut fundamental rights, including many secured by the Fourteenth Amendment, to all of which the sections may and do apply, without specific enumeration and without creating hazards of uncertainty for conduct or defense. Others will enter that category. So far, at the least when they have done so, the sections should stand without question of their validity. Beyond this, the character of the act proscribed and the intent it necessarily implies would seem to afford would-be violators all of notice the law requires, that they act at peril of the penalty it places on their misconduct.

We have in this case no instance of mere error in judgment, made in good faith. It would be time enough to reverse and remand a conviction, obtained without instructions along these lines, if such a case should arise. Actually the substance of such instruction was given in the wholly adequate charge concerning the officer's right to use force, though not to excess. When, as here, a state official abuses his place consciously or grossly in abnegation of its rightful obligation, and thereby tramples underfoot the established constitutional rights of men or citizens, his conviction should stand when he has had the fair trial and full defense the petitioners have been given in this case.

### III

Two implicit but highly important considerations must be noticed more definitely. One is the fear grounded in concern for possible maladjustment of federal-state relations if this and like convictions are sustained. Enough has been said to show that the fear is not well grounded. The same fear was expressed, by some in exaggerated and

highly emotional terms, when § 2 of the Civil Rights Act, the antecedent of § 20, was under debate in Congress.[33] The history of the legislation's enforcement gives it no support. The fear was not realized in later experience. Eighty years should be enough to remove any remaining vestige. The volume of prosecutions and convictions has been small, in view of the importance of the subject matter and the length of time the statutes have been in force. There are reasons for this, apart from self-restraint of federal prosecuting officials.

One lies in the character of the criminal act and the intent which must be proved. A strong case must be made to show abuse of official function, and therefore to secure indictment or conviction. Trial must be "by an impartial jury of the State and the district wherein the crime shall have been committed." Const., Amend. VI; cf. Art. III, § 2. For all practical purposes this means within the state of which the accused is an officer. Citizens of the state have not been, and will not be, ready to indict or convict their local officers on groundless charges or in doubtful cases. The sections can be applied effectively only when twelve of them concur in a verdict which accords with the prosecuting official's belief that the accused has violated another's fundamental rights. A federal official therefore faces both a delicate and a difficult task when he undertakes to charge and try a state officer under the terms of §§ 19 and 20. The restraint which has been shown is as much enforced by these limitations as it has been voluntary.

---

[33] See Flack, Adoption of the Fourteenth Amendment (1908) 22–38; Cong. Globe, 39th Cong., 1st Sess., 474–607, 1151 ff.

Senator Davis of Kentucky said that "this short bill repeals all the penal laws of the States. . . . The cases . . . the . . . bill would bring up every day in the United States would be as numerous as the passing minutes. The result would be to utterly subvert our Government . . ." Cong. Globe, 39th Cong., 1st Sess., 598.

These are the reasons why prosecution has not been frequent, has been brought only in cases of gross abuse, and therefore has produced no grave or substantial problem of interference by federal authority in state affairs. But if the problem in this phase of the case were more serious than it has been or is likely to be, the result legally could not be to give state officials immunity from the obligations and liabilities the Amendment and its supporting legislation have imposed. For the verdict of the struggle which brought about adoption of the Amendment was to the contrary.

Lying beneath all the surface arguments is a deeper implication, which comprehends them. It goes to federal power. It is that Congress could not in so many words denounce as a federal crime the intentional and wrongful taking of an individual's life or liberty by a state official acting in abuse of his official function and applying to the deed all the power of his office. This is the ultimate purport of the notions that state action is not involved and that the crime is against the state alone, not the nation. It is reflected also in the idea that the statute can protect the victim in his many procedural rights encompassed in the right to a fair trial before condemnation, but cannot protect him in the right which comprehends all others, the right to life itself.

Suffice it to say that if these ideas did not pass from the American scene once and for all, as I think they did, upon adoption of the Amendment without more, they have long since done so. Violation of state law there may be. But from this no immunity to federal authority can arise where any part of the Constitution has made it supreme. To the Constitution state officials and the states themselves owe first obligation. The federal power lacks no strength to reach their malfeasance in office when it infringes constitutional rights. If that is a great power, it is one generated by the Constitution and the Amend-

ments, to which the states have assented and their officials owe prime allegiance.[34]

The right not to be deprived of life or liberty by a state officer who takes it by abuse of his office and its power is such a right. To secure these rights is not beyond federal power. This §§ 19 and 20 have done, in a manner history long since has validated.

Accordingly, I would affirm the judgment.

My convictions are as I have stated them. Were it possible for me to adhere to them in my vote, and for the Court at the same time to dispose of the cause, I would act accordingly. The Court, however, is divided in opinion. If each member accords his vote to his belief, the case cannot have disposition. Stalemate should not prevail for any reason, however compelling, in a criminal cause or, if avoidable, in any other. My views concerning appropriate disposition are more nearly in accord with those stated by MR. JUSTICE DOUGLAS, in which three other members of the Court concur, than they are with the views of my dissenting brethren who favor outright reversal. Accordingly, in order that disposition may be made of this case, my vote has been cast to reverse the decision of the Court of Appeals and remand the cause to the District Court for further proceedings in accordance with the disposition required by the opinion of MR. JUSTICE DOUGLAS.

MR. JUSTICE MURPHY, dissenting.

I dissent. Robert Hall, a Negro citizen, has been deprived not only of the right to be tried by a court rather than by ordeal. He has been deprived of the right to life itself. That right belonged to him not because he was a Negro or a member of any particular race or creed. That right was his because he was an American citizen, because

---

[34] Cf. note 8.

he was a human being. As such, he was entitled to all the respect and fair treatment that befits the dignity of man, a dignity that is recognized and guaranteed by the Constitution. Yet not even the semblance of due process has been accorded him. He has been cruelly and unjustifiably beaten to death by local police officers acting under color of authority derived from the state. It is difficult to believe that such an obvious and necessary right is indefinitely guaranteed by the Constitution or is foreign to the knowledge of local police officers so as to cast any reasonable doubt on the conviction under § 20 of the Criminal Code of the perpetrators of this "shocking and revolting episode in law enforcement."

The Constitution and § 20 must be read together inasmuch as § 20 refers in part to certain provisions of the Constitution. Section 20 punishes anyone, acting under color of any law, who willfully deprives any person of any right, privilege or immunity secured or protected by the Constitution or laws of the United States. The pertinent part of the Constitution in this instance is § 1 of the Fourteenth Amendment, which firmly and unmistakably provides that no state shall deprive any person of life without due process of law. Translated in light of this specific provision of the Fourteenth Amendment, § 20 thus punishes anyone, acting under color of state law, who willfully deprives any person of life without due process of law. Such is the clear statutory provision upon which this conviction must stand or fall.

A grave constitutional issue, however, is said to lurk in the alleged indefiniteness of the crime outlawed by § 20. The rights, privileges and immunities secured or protected by the Constitution or laws of the United States are claimed to be so uncertain and flexible, dependent upon changeable legal concepts, as to leave a state official confused and ignorant as to what actions of his might run afoul of the law. The statute, it is concluded, must be set aside for vagueness.

It is axiomatic, of course, that a criminal statute must give a clear and unmistakable warning as to the acts which will subject one to criminal punishment. And courts are without power to supply that which Congress has left vague. But this salutary principle does not mean that if a statute is vague as to certain criminal acts but definite as to others the entire statute must fall. Nor does it mean that in the first case involving the statute to come before us we must delineate all the prohibited acts that are obscure and all those that are explicit.

Thus it is idle to speculate on other situations that might involve § 20 which are not now before us. We are unconcerned here with state officials who have coerced a confession from a prisoner, denied counsel to a defendant or made a faulty tax assessment. Whatever doubt may exist in those or in other situations as to whether the state officials could reasonably anticipate and recognize the relevant constitutional rights is immaterial in this case. Our attention here is directed solely to three state officials who, in the course of their official duties, have unjustifiably beaten and crushed the body of a human being, thereby depriving him of trial by jury and of life itself. The only pertinent inquiry is whether § 20, by its reference to the Fourteenth Amendment guarantee that no state shall deprive any person of life without due process of law, gives fair warning to state officials that they are criminally liable for violating this right to life.

Common sense gives an affirmative answer to that problem. The reference in § 20 to rights protected by the Constitution is manifest and simple. At the same time, the right not to be deprived of life without due process of law is distinctly and lucidly protected by the Fourteenth Amendment. There is nothing vague or indefinite in these references to this most basic of all human rights. Knowledge of a comprehensive law library is unnecessary for officers of the law to know that the right to murder

individuals in the course of their duties is unrecognized in this nation. No appreciable amount of intelligence or conjecture on the part of the lowliest state official is needed for him to realize that fact; nor should it surprise him to find out that the Constitution protects persons from his reckless disregard of human life and that statutes punish him therefor. To subject a state official to punishment under § 20 for such acts is not to penalize him without fair and definite warning. Rather it is to uphold elementary standards of decency and to make American principles of law and our constitutional guarantees mean something more than pious rhetoric.

Under these circumstances it is unnecessary to send this case back for a further trial on the assumption that the jury was not charged on the matter of the willfulness of the state officials, an issue that was not raised below or before us. The evidence is more than convincing that the officials willfully, or at least with wanton disregard of the consequences, deprived Robert Hall of his life without due process of law. A new trial could hardly make that fact more evident; the failure to charge the jury on willfulness was at most an inconsequential error. Moreover, the presence or absence of willfulness fails to decide the constitutional issue raised before us. Section 20 is very definite and certain in its reference to the right to life as spelled out in the Fourteenth Amendment quite apart from the state of mind of the state officials. A finding of willfulness can add nothing to the clarity of that reference.

It is an illusion to say that the real issue in this case is the alleged failure of § 20 fully to warn the state officials that their actions were illegal. The Constitution, § 20 and their own consciences told them that. They knew that they lacked any mandate or authority to take human life unnecessarily or without due process of law in the course of their duties. They knew that their excessive and abusive

use of authority would only subvert the ends of justice. The significant question, rather, is whether law enforcement officers and those entrusted with authority shall be allowed to violate with impunity the clear constitutional rights of the inarticulate and the friendless. Too often unpopular minorities, such as Negroes, are unable to find effective refuge from the cruelties of bigoted and ruthless authority. States are undoubtedly capable of punishing their officers who commit such outrages. But where, as here, the states are unwilling for some reason to prosecute such crimes the federal government must step in unless constitutional guarantees are to become atrophied.

This necessary intervention, however, will be futile if courts disregard reality and misuse the principle that criminal statutes must be clear and definite. Here state officers have violated with reckless abandon a plain constitutional right of an American citizen. The two courts below have found and the record demonstrates that the trial was fair and the evidence of guilt clear. And § 20 unmistakably outlaws such actions by state officers. We should therefore affirm the judgment.

MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON, dissenting.

Three law enforcement officers of Georgia, a county sheriff, a special deputy and a city policeman, arrested a young Negro charged with a local crime, that of stealing a tire. While he was in their custody and handcuffed, they so severely beat the lad that he died. This brutal misconduct rendered these lawless law officers guilty of manslaughter, if not of murder, under Georgia law. Instead of leaving this misdeed to vindication by Georgia law, the United States deflected Georgia's responsibility by instituting a federal prosecution. But this was a criminal homicide only under Georgia law. The United States could not prosecute the petitioners for taking life. In-

stead a prosecution was brought, and the conviction now under review was obtained, under § 20 of the Criminal Code, 18 U. S. C. § 52. Section 20, originating in § 2 of the Civil Rights Act of April 9, 1866, 14 Stat. 27, was put on the statute books on May 31, 1870, but for all practical purposes it has remained a dead letter all these years. This section provides that "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects . . . any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States . . . shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both." Under § 37 of the Criminal Code, 18 U. S. C. § 88, a conspiracy to commit any federal offense is punishable by imprisonment for two years. The theory of this prosecution is that one charged with crime is entitled to due process of law and that that includes the right to an orderly trial of which the petitioners deprived the Negro.

Of course the petitioners are punishable. The only issue is whether Georgia alone has the power and duty to punish, or whether this patently local crime can be made the basis of a federal prosecution. The practical question is whether the States should be relieved from responsibility to bring their law officers to book for homicide, by allowing prosecutions in the federal courts for a relatively minor offense carrying a short sentence. The legal question is whether, for the purpose of accomplishing this relaxation of State responsibility, hitherto settled principles for the protection of civil liberties shall be bent and tortured.

I

By the Thirteenth Amendment slavery was abolished. In order to secure equality of treatment for the emancipated, the Fourteenth Amendment was adopted at the

same time. To be sure, the latter Amendment has not been confined to instances of discrimination because of race or color. Undoubtedly, however, the necessary protection of the new freedmen was the most powerful impulse behind the Fourteenth Amendment. The vital part of that Amendment, § 1, reads as follows:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

By itself, this Amendment is merely an instrument for striking down action by the States in defiance of it. It does not create rights and obligations actively enforceable by federal law. However, like all rights secured by the Constitution of the United States, those created by the Fourteenth Amendment could be enforced by appropriate federal legislation. The general power of Congress to pass measures effectuating the Constitution is given by Art. I, § 8, cl. 18—the Necessary-and-Proper Clause. In order to indicate the importance of enforcing the guarantees of Amendment XIV, its fifth section specifically provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

Accordingly, Congress passed various measures for its enforcement. It is familiar history that much of this legislation was born of that vengeful spirit which to no small degree envenomed the Reconstruction era. Legislative respect for constitutional limitations was not at its height and Congress passed laws clearly unconstitutional. See *Civil Rights Cases,* 109 U. S. 3. One of the laws of this period was the Act of May 31, 1870, 16 Stat. 140. In its

present form, as § 20, it is now here for the first time on full consideration as to its meaning and its constitutionality, unembarrassed by preoccupation both on the part of counsel and Court with the more compelling issue of the power of Congress to control State procedure for the election of federal officers. If § 20 were read as other legislation is read, by giving it the meaning which its language in its proper setting naturally and spontaneously yields, it is difficult to believe that there would be real doubt about the proper construction. The unstrained significance of the words chosen by Congress, the disclosed purpose for which they were chosen and to which they were limited, the always relevant implications of our federal system especially in the distribution of power and responsibility for the enforcement of the criminal law as between the States and the National Government, all converge to make plain what conduct Congress outlawed by the Act of 1870 and what impliedly it did not.

The Fourteenth Amendment prohibited a State from so acting as to deprive persons of new federal rights defined by it. Section 5 of the Amendment specifically authorized enabling legislation to enforce that prohibition. Since a State can act only through its officers, Congress provided for the prosecution of any officer who deprives others of their guaranteed rights and denied such an officer the right to defend by claiming the authority of the State for his action. In short, Congress said that no State can empower an officer to commit acts which the Constitution forbade the State from authorizing, whether such unauthorized command be given for the State by its legislative or judicial voice, or by a custom contradicting the written law. See *Nashville, C. & St. L. R. Co.* v. *Browning,* 310 U. S. 362, 369. The present prosecution is not based on an officer's claim that that for which the United States seeks his punishment was commanded or authorized by the law of his State. On the contrary,

the present prosecution is based on the theory that Congress made it a federal offense for a State officer to violate the explicit law of his State. We are asked to construe legislation which was intended to effectuate prohibitions against States for defiance of the Constitution, to be equally applicable where a State duly obeys the Constitution, but an officer flouts State law and is unquestionably subject to punishment by the State for his disobedience.

So to read § 20 disregards not merely the normal function of language to express ideas appropriately. It fails not merely to leave to the States the province of local crime enforcement, that the proper balance of political forces in our federalism requires. It does both, heedless of the Congressional purpose, clearly evinced even during the feverish Reconstruction days, to leave undisturbed the power and the duty of the States to enforce their criminal law by restricting federal authority to the punishment only of those persons who violate federal rights under claim of State authority and not by exerting federal authority against offenders of State authority. Such a distortion of federal power devised against recalcitrant State authority never entered the minds of the proponents of the legislation.

Indeed, we have the weightiest evidence to indicate that they rejected that which now, after seventy-five years, the Government urges. Section 20 of the Criminal Code derived from § 2 of the Civil Rights Act of 1866, 14 Stat. 27. During the debate on that section, Senator Trumbull, the Chairman of the Senate Judiciary Committee, answered fears concerning the loose inclusiveness of the phrase "color of law." In particular, opponents of the Act were troubled lest it would make criminals of State judges and officials for carrying out their legal duties. Senator Trumbull agreed that they would be guilty if they consciously helped to enforce discriminatory State

legislation. Federal law, replied Senator Trumbull, was
directed against those, and only against those, who were
not punishable by State law precisely because they acted
in obedience to unconstitutional State law and by State
law justified their action. Said Senator Trumbull, "If
an offense is committed against a colored person simply
because he is colored, in a State where the law affords
him the same protection as if he were white, this act
neither has nor was intended to have anything to do with
his case, because he has adequate remedies in the State
courts; but if he is discriminated against under color of
State laws because he is colored, then it becomes necessary
to interfere for his protection." Cong. Globe, 39th Cong.,
1st Sess., p. 1758. And this language applies equally to
§ 17 of the Act of May 31, 1870, 16 Stat. 140, 144 (now
§ 20 of the Criminal Code), which reenacted the Civil
Rights Act.

That this legislation was confined to attempted depri-
vations of federal rights by State law and was not extended
to breaches of State law by its officials, is likewise con-
firmed by observations of Senator Sherman, another lead-
ing Reconstruction statesman. When asked about the
applicability of the 1870 Act to a Negro's right to vote
when State law provided for that right, Senator Sherman
replied, "That is not the case with which we are dealing.
I intend to propose an amendment to present a question
of that kind. This bill only proposes to deal with offenses
committed by officers or persons under color of existing
State law, under color of existing State constitutions. No
man could be convicted under this bill reported by the
Judiciary Committee unless the denial of the right to
vote was done under color or pretense of State regulation.
The whole bill shows that. My honorable friend from
California has not read this bill with his usual care if he
does not see that that runs through the whole of the pro-
visions of the first and second sections of the bill, which

144

simply punish officers as well as persons for discrimination under color of State laws or constitutions; and so it provides all the way through." Cong. Globe, 41st Cong., 2d Sess., p. 3663. The debates in Congress are barren of any indication that the supporters of the legislation now before us had the remotest notion of authorizing the National Government to prosecute State officers for conduct which their State had made a State offense where the settled custom of the State did not run counter to formulated law.

Were it otherwise it would indeed be surprising. It was natural to give the shelter of the Constitution to those basic human rights for the vindication of which the successful conduct of the Civil War was the end of a long process. And the extension of federal authority so as to guard against evasion by any State of these newly created federal rights was an obvious corollary. But to attribute to Congress the making overnight of a revolutionary change in the balance of the political relations between the National Government and the States without reason, is a very different thing. And to have provided for the National Government to take over the administration of criminal justice from the States to the extent of making every lawless act of the policeman on the beat or in the station house, whether by way of third degree or the illegal ransacking for evidence in a man's house (see *Gouled* v. *United States,* 255 U. S. 298; *Byars* v. *United States,* 273 U. S. 28; *Brown* v. *Mississippi,* 297 U. S. 278; *Chambers* v. *Florida,* 309 U. S. 227), a federal offense, would have constituted a revolutionary break with the past overnight. The desire for such a dislocation in our federal system plainly was not contemplated by the Lyman Trumbulls and the John Shermans, and not even by the Thaddeus Stevenses.

Regard for maintaining the delicate balance "between the judicial tribunals of the Union and of the States" in

the enforcement of the criminal law has informed this Court, as it has influenced Congress, "in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution." *Ex parte Royall*, 117 U. S. 241, 251. Observance of this basic principle under our system of Government has led this Court to abstain, even under more tempting circumstances than those now here, from needless extension of federal criminal authority into matters that normally are of State concern and for which the States had best be charged with responsibility.

We have reference to § 33 of the Judicial Code, as amended, 28 U. S. C. § 76. That provision gives the right of removal to a federal court of any criminal prosecution begun in a State court against a revenue officer of the United States "on account of any act done under color of his office or of any such [revenue] law." Where a State prosecution for manslaughter is resisted by the claim that what was done was justifiably done by a United States officer one would suppose that this Court would be alert to construe very broadly "under color of his office or of any such law" in order to avoid the hazards of trial, whether through conscious or unconscious discrimination or hostility, of a United States officer accused of homicide and to assure him a trial in a presumably more impartial federal court. But this Court long ago indicated that misuse of federal authority does not come within the statute's protection. *Tennessee* v. *Davis,* 100 U. S. 257, 261–262. More recently, this Court in a series of cases unanimously insisted that a petition for removal must show with particularity that the offense for which the State is prosecuting resulted from a discharge of federal duty. "It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and

he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty. . . . The defense he is to make is that of his immunity from punishment by the State, because what he did was justified by his duty under the federal law, and because he did nothing else on which the prosecution could be based." *Maryland* v. *Soper* (No. 1), 270 U. S. 9, 33. And see *Maryland* v. *Soper* (No. 2), 270 U. S. 36; *Maryland* v. *Soper* (No. 3), 270 U. S. 44; *Colorado* v. *Symes,* 286 U. S. 510. To the suggestion that such a limited construction of the removal statute enacted for the protection of the United States officers would restrict its effectiveness, the answer was that if Congress chose to afford even greater protection and to withdraw from the States the right and duty to enforce their criminal law in their own courts, it should express its desire more specifically. *Maryland* v. *Soper* (No. 2), 270 U. S. 36, 42, 44. That answer should be binding in the situation now before us.

The reasons which led this Court to give such a restricted scope to the removal statute are even more compelling as to § 20. The matter concerns policies inherent in our federal system and the undesirable consequences of federal prosecution for crimes which are obviously and predominantly State crimes no matter how much sophisticated argumentation may give them the appearance of federal crimes. Congress has not expressed a contrary purpose, either by the language of its legislation or by anything appearing in the environment out of which its language came. The practice of government for seventy-five years likewise speaks against it. Nor is there a body of judicial opinion which bids us find in the unbridled excess of a State officer, constituting a crime under his State law, action taken "under color of law" which federal law forbids.

Only two reported cases considered § 20 before *United States* v. *Classic,* 313 U. S. 299, In *United States* v. *Bun-*

*tin,* 10 F. 730, a teacher, in reliance on a State statute, refused admittance to a colored child, while in *United States* v. *Stone,* 188 F. 836, election supervisors who acted under a Maryland election law were held to act "under color of law." In neither case was there a patent violation of State law but rather an attempt at justification under State law. *United States* v. *Classic, supra,* is the only decision that looks the other way. In that case primary election officials were held to have acted "under color of law" even though the acts complained of as a federal offense were likewise condemned by Louisiana law. The truth of the matter is that the focus of attention in the *Classic* case was not our present problem, but was the relation of primaries to the protection of the electoral process under the United States Constitution. The views in the *Classic* case thus reached ought not to stand in the way of a decision on the merits of a question which has now for the first time been fully explored and its implications for the workings of our federal system have been adequately revealed.

It was assumed quite needlessly in the *Classic* case that the scope of § 20 was coextensive with the Fourteenth Amendment. Because the weight of the case was elsewhere, we did not pursue the difference between the power granted to Congress by that Amendment to bar "any State" from depriving persons of the newly created constitutional rights and the limited extent to which Congress exercised that power, in what is now § 20, by making it an offense for one acting "under color of any law" to deprive another of such constitutional rights. It may well be that Congress could, within the bounds of the Fourteenth Amendment, treat action taken by a State official even though in defiance of State law and not condoned by ultimate State authority as the action of "a State." It has never been satisfactorily explained how a State can be said to deprive a person of liberty or property without

due process of law when the foundation of the claim is that a minor official has disobeyed the authentic command of his State. See *Raymond* v. *Chicago Traction Co.*, 207 U. S. 20, 40, 41. Although action taken under such circumstances has been deemed to be deprivation by a "State" of rights guaranteed by the Fourteenth Amendment for purposes of federal jurisdiction, the doctrine has had a fluctuating and dubious history. Compare *Barney* v. *City of New York*, 193 U. S. 430, with *Raymond* v. *Chicago Traction Co., supra; Memphis* v. *Cumberland Telephone Co.*, 218 U. S. 624, with *Home Tel. & Tel. Co.* v. *Los Angeles*, 227 U. S. 278. *Barney* v. *City of New York, supra,* which ruled otherwise, although questioned, has never been overruled. See, for instance, *Iowa-Des Moines Bank* v. *Bennett*, 284 U. S. 239, 246–247, and *Snowden* v. *Hughes*, 321 U. S. 1, 13.[1]

But assuming unreservedly that conduct such as that now before us, perpetrated by State officers in flagrant defiance of State law, may be attributed to the State under the Fourteenth Amendment, this does not make it action under "color of any law." Section 20 is much narrower than the power of Congress. Even though Congress might have swept within the federal criminal law any action that could be deemed within the vast reach of the Fourteenth Amendment, Congress did not do so. The presuppositions of our federal system, the pronouncements of the statesmen who shaped this legislation, and the normal meaning of language powerfully counsel against attributing to Congress intrusion into the sphere of criminal law tradition-

---

[1] *Iowa-Des Moines Bank* v. *Bennett, supra,* illustrates the situation where there can be no doubt that the action complained of was the action of a State. That case came here from a State court as the ultimate voice of State law authenticating the alleged illegal action as the law of the State. Cases of which *Lane* v. *Wilson*, 307 U. S. 268, is an illustration are also to be differentiated. In that case election officials discriminated illegally against Negroes not in defiance of a State statute but under its authority.

ally and naturally reserved for the States alone. When due account is taken of the considerations that have heretofore controlled the political and legal relations between the States and the National Government, there is not the slightest warrant in the reason of things for torturing language plainly designed for nullifying a claim of acting under a State law that conflicts with the Constitution so as to apply to situations where State law is in conformity with the Constitution and local misconduct is in undisputed violation of that State law. In the absence of clear direction by Congress we should leave to the States the enforcement of their criminal law, and not relieve States of the responsibility for vindicating wrongdoing that is essentially local or weaken the habits of local law enforcement by tempting reliance on federal authority for an occasional unpleasant task of local enforcement.

II

In our view then, the Government's attempt to bring an unjustifiable homicide by local Georgia peace officers within the defined limits of the federal Criminal Code cannot clear the first hurdle of the legal requirement that that which these officers are charged with doing must be done under color of Georgia law.

Since the majority of the Court do not share this conviction that the action of the Georgia peace officers was not perpetrated under color of law, we, too, must consider the constitutionality of § 20. All but two members of the Court apparently agree that insofar as § 20 purports to subject men to punishment for crime it fails to define what conduct is made criminal. As misuse of the criminal machinery is one of the most potent and familiar instruments of arbitrary government, proper regard for the rational requirement of definiteness in criminal statutes is basic to civil liberties. As such it is included in the constitutional guaranty of due process of law. But four

150

members of the Court are of the opinion that this plain constitutional principle of definiteness in criminal statutes may be replaced by an elaborate scheme of constitutional exegesis whereby that which Congress has not defined the courts can define from time to time, with varying and conflicting definiteness in the decisions, and that, in any event, an undefined range of conduct may become sufficiently definite if only such undefined conduct is committed "willfully."

In subjecting to punishment "deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States," § 20 on its face makes criminal deprivation of the whole range of undefined appeals to the Constitution. Such is the true scope of the forbidden conduct. Its domain is unbounded and therefore too indefinite. Criminal statutes must have more or less specific contours. This has none.

To suggest that the "right" deprivation of which is made criminal by § 20 "has been made specific either by the express terms of the Constitution or by decisions interpreting it" hardly adds definiteness beyond that of the statute's own terms. What provision is to be deemed "specific" "by the express terms of the Constitution" and what not "specific"? If the First Amendment safeguarding free speech be a "specific" provision, what about the Fourth? "All unreasonable searches and seizures are absolutely forbidden by the Fourth Amendment." *Nathanson* v. *United States,* 290 U. S. 41, 46. Surely each is among the "rights, privileges, or immunities secured or protected by the Constitution," deprivation of which is a crime under § 20. In any event, what are the criteria by which to determine what express provisions of the Constitution are "specific" and what provisions are not "specific"? And if the terms of § 20 in and of themselves are lacking in sufficient definiteness for a criminal statute, restriction within the framework of "decisions interpret-

ing" the Constitution cannot show the necessary definiteness. The illustrations given in the Court's opinion underline the inescapable vagueness due to the doubts and fluctuating character of decisions interpreting the Constitution.

This intrinsic vagueness of the terms of § 20 surely cannot be removed by making the statute applicable only where the defendant has the "requisite bad purpose." Does that not amount to saying that the black heart of the defendant enables him to know what are the constitutional rights deprivation of which the statute forbids, although we as judges are not able to define their classes or their limits, or, at least, are not prepared to state what they are unless it be to say that § 20 protects whatever rights the Constitution protects?

Under the construction proposed for § 20, in order for a jury to convict, it would be necessary "to find that petitioners had the purpose to deprive the prisoner of a constitutional right, e. g. the right to be tried by a court rather than by ordeal." There is no question that Congress could provide for a penalty against deprivation by State officials "acting under color of any law" of "the right to be tried by a court rather than by ordeal." But we cannot restrict the problem raised by § 20 to the validity of penalizing a deprivation of this specific constitutional right. We are dealing with the reach of the statute, for Congress has not particularized as the Court now particularizes. Such transforming interpolation is not interpretation. And that is recognized by the sentence just quoted, namely, that the jury in order to convict under § 20 must find that an accused "had the purpose to deprive" another "of a constitutional right," giving *this* specific constitutional right as "e. g.," by way of illustration. Hence a judge would have to define to the jury what the constitutional rights are deprivation of which is prohibited by § 20. If that is a legal question as to which

the jury must take instruction from the court, at least the trial court must be possessed of the means of knowing with sufficient definiteness the range of "rights" that are "constitutional." The court can hardly be helped out in determining that legal question by leaving it to the jury to decide whether the act was "willfully" committed.

It is not conceivable that this Court would find that a statute cast in the following terms would satisfy the constitutional requirement for definiteness:

"Whoever WILLFULLY commits any act which the Supreme Court of the United States shall find to be a deprivation of any right, privilege, or immunity secured or protected by the Constitution shall be imprisoned not more than, etc."

If such a statute would fall for uncertainty, wherein does § 20 as construed by the Court differ and how can it survive?

It was settled early in our history that prosecutions in the federal courts could not be founded on any undefined body of so-called common law. *United States* v. *Hudson,* 7 Cranch 32; *United States* v. *Gooding,* 12 Wheat. 460. Federal prosecutions must be founded on delineation by Congress of what is made criminal. To base federal prosecutions on the shifting and indeterminate decisions of courts is to sanction prosecutions for crimes based on definitions made by courts. This is tantamount to creating a new body of federal criminal common law.

It cannot be too often emphasized that as basic a difference as any between our notions of law and those of legal systems not founded on Anglo-American conceptions of liberty is that crimes must be defined by the legislature. The legislature does not meet this requirement by issuing a blank check to courts for their retrospective finding that some act done in the past comes within the contingencies and conflicts that inhere in ascertaining the content of the Fourteenth Amendment by "the gradual process of

judicial inclusion and exclusion." *Davidson* v. *New Orleans,* 96 U. S. 97, 104. Therefore, to subject to criminal punishment conduct that the court may eventually find to have been within the scope or the limitations of a legal doctrine underlying a decision is to satisfy the vital requirement for definiteness through an appearance of definiteness in the process of constitutional adjudication which every student of law knows not to comport with actuality. What the Constitution requires is a definiteness defined by the legislature, not one argumentatively spelled out through the judicial process which, precisely because it is a process, can not avoid incompleteness. A definiteness which requires so much subtlety to expound is hardly definite.

It is as novel as it is an inadmissible principle that a criminal statute of indefinite scope can be rendered definite by requiring that a person "willfully" commit what Congress has not defined but which, if Congress had defined, could constitutionally be outlawed. Of course Congress can prohibit the deprivation of enumerated constitutional rights. But if Congress makes it a crime to deprive another of any right protected by the Constitution—and that is what § 20 does—this Court cannot escape facing decisions as to what constitutional rights are covered by § 20 by saying that in any event, whatever they are, they must be taken away "willfully." It has not been explained how all the considerations of unconstitutional vagueness which are laid bare in the early part of the Court's opinion evaporate by suggesting that what is otherwise too vaguely defined must be "willfully" committed.

In the early law an undesired event attributable to a particular person was punished regardless of the state of mind of the actor. The rational development of criminal liability added a mental requirement for criminal culpability, except in a limited class of cases not here relevant. (See *United States* v. *Balint,* 258 U. S. 250.) That req-

uisite mental ingredient is expressed in various forms in criminal statutes, of which the word "willfully" is one of the most common. When a criminal statute prohibits something from being "willfully" done, "willfully" never defines the physical conduct or the result the bringing of which to pass is proscribed. "Willfully" merely adds a certain state of mind as a prerequisite to criminal responsibility for the otherwise proscribed act. If a statute does not satisfy the due-process requirement of giving decent advance notice of what it is which, if happening, will be visited with punishment, so that men may presumably have an opportunity to avoid the happening (see *International Harvester Co.* v. *Kentucky,* 234 U. S. 216; *Collins* v. *Kentucky,* 234 U. S. 634; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81; *Cline* v. *Frink Dairy Co.,* 274 U. S. 445), then "willfully" bringing to pass such an undefined and too uncertain event cannot make it sufficiently definite and ascertainable. "Willfully" doing something that is forbidden, when that something is not sufficiently defined according to the general conceptions of requisite certainty in our criminal law, is not rendered sufficiently definite by that unknowable having been done "willfully." It is true also of a statute that it cannot lift itself up by its bootstraps.

Certainly these considerations of vagueness imply unconstitutionality of the Act at least until 1909. For it was not until 1909 that the word "willfully" was introduced. But the legislative history of that addition affords no evidence whatever that anybody thought that "willfully" was added to save the statute from unconstitutionality. The Joint Committee of Congress on the Revision of Laws (which sponsored what became the Criminal Code) gives no such indication, for it did not propose "willfully"; the reports in neither House of Congress shed any light on the subject, for the bill in neither House proposed that "willfully" be added; no speech by anyone in charge of the

bill in either House sheds any light on the subject; the report of the Conference Committee, from which "willfully" for the first time emerges, gives no explanation whatever; and the only reference we have is that to which the Court's opinion refers (43 Cong. Rec., p. 3599). And that is an unilluminating remark by Senator Daniel of Virginia, who had no responsibility for the measure and who made the remark in the course of an exchange with Senator Heyburn of Idaho, who *was* in charge of the measure and who complained of an alleged attitude on the part of Southern members to filibuster against the bill because of the retention of Reconstruction legislation.

All this bears not merely on the significance of "willfully" in a presumably otherwise unconstitutionally vague statute. It also bears on the fact that, for the purpose of constitutionality, we are dealing not with an old statute that goes back to the Reconstruction days, but only to 1909.

Nor can support be found in the opinions of this Court for the proposition that "willfully" can make definite prohibitions otherwise indefinite.

In *Omaechevarria* v. *Idaho,* 246 U. S. 343, the Court sustained an Idaho statute prohibiting any person having charge of sheep from allowing them to graze "upon any range usually occupied by any cattle grower." The statute was attacked under the Due Process Clause in that it failed to provide for the ascertainment of the boundaries of a "range" or for determining what length of time is necessary to constitute a prior occupation a "usual" one within the meaning of the Act. This attack upon the Idaho statute was rejected and for the following reasons:

"Men familiar with range conditions and desirous of observing the law will have little difficulty in determining what is prohibited by it. Similar expressions are common in the criminal statutes of other [grazing] States. This

statute presents no greater uncertainty or difficulty, in application to necessarily varying facts, than has been repeatedly sanctioned by this court." 246 U. S. at 348.

Certainly there is no comparison between a statute employing the concept of a western range and a statute outlawing the whole range of constitutional rights, unascertained if not unascertainable.

To be sure, the opinion of Mr. Justice Brandeis also brought to its support § 6314 of Revised Codes of Idaho which provided that "In every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence." But this is merely an Idaho phrasing of the conventional saw in text books and decisions dealing with criminal law that there must be a *mens rea* for every offense. In other words, a guilty state of mind is usually required before one can be punished for an outlawed act. But the definition of the outlawed act is not derived from the state of mind with which it must be committed. All that Mr. Justice Brandeis meant by "indefiniteness" in the context of this statute was the claim that the statute did not give enough notice as to the act which was outlawed. But notice was given by the common knowledge of what a "range" was, and for good measure he suggested that under the Act a man would have to know that he was grazing sheep where he had no business to graze them. There is no analogy between the face of this Idaho statute and the face of our statute. The essential difference is that in the Idaho statute the outlawed act was defined; in § 20 it is undefined.

In *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, New York punished the misrepresentation of meat as "kosher" or as satisfying "orthodox Hebrew religious requirements." Here, too, the objection of indefiniteness was rejected by this Court. The objection bordered on the frivolous. In this case, too, the opinion of the Court, as is the way of opinions, softened the blow by saying that

there was no danger of anyone being convicted for not knowing what he was doing, for it required him to have consciousness that he was offering meat as "kosher" meat when he knew very well that it was not.

Thus in both these cases this Court was saying that the criminal statutes under scrutiny, although very specific, did not expose any innocent person to the hazards of unfair conviction, because not merely did the legislation outlaw specifically defined conduct, but guilty knowledge of such defined criminality was also required. It thereby took the legislation outside the scope of *United States* v. *Balint,* 258 U. S. 250, in which the Court sustained the prosecution of one wholly innocent of knowledge of the act, commission of which the statute explicitly forbade.

This case does not involve denying adequate *power* to Congress. There is no difficulty in passing effective legislation for the protection of civil rights against improper State action. What we are concerned with here is something basic in a democratic society, namely, the avoidance of the injustice of prohibiting conduct in terms so vague as to make the understanding of what is proscribed a guess-work too difficult for confident judgment even for the judges of the highest Court in the land.

### III

By holding, in this case, that State officials who violate State law nevertheless act "under color of" State law, and by establishing as federal crimes violations of the vast, undisclosed range of the Fourteenth Amendment, this Court now creates new delicate and complicated problems for the enforcement of the criminal law. The answers given to these problems, in view of the tremendous scope of potential offenses against the Fourteenth Amendment, are bound to produce a confusion detrimental to the administration of criminal justice.

The Government recognizes that "this is the first case brought before this Court in which § 20 has been applied

to deprivations of rights secured by the Fourteenth Amendment." It is not denied that the Government's contention would make a potential offender against this act of any State official who as a judge admitted a confession of crime, or who as judge of a State court of last resort sustained admission of a confession, which we should later hold constitutionally inadmissible, or who as a public service commissioner issued a regulatory order which we should later hold denied due process or who as a municipal officer stopped any conduct we later should hold to be constitutionally protected. The Due Process Clause of the Fourteenth Amendment has a content the scope of which this Court determines only as cases come here from time to time and then not without close division and reversals of position. Such a dubious construction of a criminal statute should not be made unless language compels.

That such a pliable instrument of prosecution is to be feared appears to be recognized by the Government. It urges three safeguards against abuse of the broad powers of prosecution for which it contends. (1) Congress, it says, will supervise the Department's policies and curb excesses by withdrawal of funds. It surely is casting an impossible burden upon Congress to expect it to police the propriety of prosecutions by the Department of Justice. Nor would such detailed oversight by Congress make for the effective administration of the criminal law. (2) The Government further urges that, since prosecutions must be brought in the district where the crime was committed, the judge and jurors of that locality can be depended upon to protect against federal interference with State law enforcement. Such a suggestion would, for practical purposes, transfer the functions of this Court, which adjudicates questions concerning the proper relationship between the federal and State governments, to jurors whose function is to resolve factual questions. Moreover,

if federal and State prosecutions are subject to the same influences, it is difficult to see what need there is for taking the prosecution out of the hands of the State. After all, Georgia citizens sitting as a federal grand jury indicted and other Georgia citizens sitting as a federal trial jury convicted Screws and his associates; and it was a Georgia judge who charged more strongly against them than this Court thinks he should have.

Finally, the Department of Justice gives us this assurance of its moderation:

"(3) The Department of Justice has established a policy of strict self-limitation with regard to prosecutions under the civil rights acts. When violations of such statutes are reported, the Department requires that efforts be made to encourage state officials to take appropriate action under state law. To assure consistent observance of this policy in the enforcement of the civil rights statutes, all United States Attorneys have been instructed to submit cases to the Department for approval before prosecutions or investigations are instituted. The number of prosecutions which have been brought under the civil rights statutes is small. No statistics are available with respect to the number of prosecutions prior to 1939, when a special Civil Rights Section was established in the Department of Justice. Only two cases during this period have been reported: *United States* v. *Buntin,* 10 Fed. 730 (C. C. S. D. Ohio), and *United States* v. *Stone,* 188 Fed. 836 (D. Md.). Since 1939, the number of complaints received annually by the Civil Rights Section has ranged from 8,000 to 14,000, but in no year have prosecutions under both Sections 20 and 19, its companion statute, exceeded 76. In the fiscal year 1943, for example, 31 full investigations of alleged violations of Section 20 were conducted, and three cases were brought to trial. In the following fiscal year there were 55 such investigations, and prosecutions were instituted in 12 cases.

160

"Complaints of violations are often submitted to the Department by local law enforcement officials who for one reason or another may feel themselves powerless to take action under state law. It is primarily in this area, namely, where the official position of the wrongdoers has apparently rendered the State unable or unwilling to institute proceedings, that the statute has come into operation. Thus, in the case at bar, the Solicitor General of the Albany Circuit in the State of Georgia, which included Baker County, testified (R. 42): 'There has been no complaint filed with me in connection with the death of Bobby Hall against Sheriff Screws, Jones, and Kelley. As to whom I depend for investigation of matters that come into my Court, I am an attorney, I am not a detective and I depend on evidence that is available after I come to Court or get into the case . . . The sheriffs and other peace officers of the community generally get the evidence and I act as the attorney for the state. I rely on my sheriffs and policemen and peace officers and private citizens also who prosecute each other to investigate the charges that are lodged in court.' "

But such a "policy of strict self-limitation" is not accompanied by assurance of permanent tenure and immortality of those who make it the policy. Evil men are rarely given power; they take it over from better men to whom it had been entrusted. There can be no doubt that this shapeless and all-embracing statute can serve as a dangerous instrument of political intimidation and coercion in the hands of those so inclined.

We are told local authorities cannot be relied upon for courageous and prompt action, that often they have personal or political reasons for refusing to prosecute. If it be significantly true that crimes against local law cannot be locally prosecuted, it is an ominous sign indeed. In any event, the cure is a reinvigoration of State responsibility. It is not an undue incursion of remote federal

authority into local duties with consequent debilitation of local responsibility.

The complicated and subtle problems for law enforcement raised by the Court's decision emphasize the conclusion that § 20 was never designed for the use to which it has now been fashioned. The Government admits that it is appropriate to leave the punishment of such crimes as this to local authorities. Regard for this wisdom in federal-State relations was not left by Congress to executive discretion. It is, we are convinced, embodied in the statute itself.