MURPHY, Circuit Judge,
with whom McMILLIAN, Circuit Judge, joins, dissenting.
Because the court’s reading of 11 U.S.C. § 523(a)(6) goes beyond the language of the statute and its interpretation by other circuit courts, and because it unnecessarily restricts this exception to dischargeability, I respectfully dissent.
Although the court states the question in this case to be whether a medical malpractice judgment debt is dischargeable in bankruptcy, it is more accurately stated to be whether the particular judgment debt of Dr. Paul Geiger may be discharged. After a jury trial for medical malpractice in Hawaii, the Kawaauhaus obtained valid state judgments against Dr. Geiger in the total amount of $355,040. He left Hawaii and settled in St. Louis. When the Kawaauhaus attempted to collect their judgment in Missouri, Dr. Geiger filed for protection under Chapter 7 of the bankruptcy code. His only significant debt was the state court judgment awarded to the Kawaauhaus. After a hearing, the bankruptcy court found that under § 523(a)(6) Dr. Geiger’s debt was not dischargeable because it qualified for exception as a willful and malicious injury. The district court affirmed, concluding that under In re Long, 774 F.2d 875 (8th Cir.1985), the debt was not dis-chargeable because Dr. Geiger knew his treatment was substandard and that it was certain or substantially certain to cause Mrs. Kawaauhau harm.
The court reverses because it concludes that Dr. Geiger’s actions were not willful “even when [the evidence is] viewed in a light most favorable to the Kawaauhaus,” but its recitation of the facts and its discussion of them does not reflect adherence to this principle.
The evidence before us comes from the record made in the bankruptcy court. At the bankruptcy court hearing the Kawaauhaus offered four exhibits which were accepted into evidence without objection. These exhibits consisted of evidence from the state trial (portions of the state trial transcript and a report prepared by the Kawaauhaus’ expert witness, Dr. Peter Halford, a board certified surgeon), and evidence prepared for the bankruptcy hearing (a deposition and affidavit of Dr. Halford). Dr. Geiger testified at the hearing on his own behalf, but offered no other evidence.
The bankruptcy court made the following findings of facts. On or about January 4, 1983, Mrs. Kawaauhau sought medical treatment from Dr. Geiger. She had been a patient of his in the past and had numerous medical conditions with which Dr. Geiger was familiar. In this particular instance, she had dropped a box on her right foot, her leg was swollen and red, and pus oozed from beneath the nail of her large toe. She complained of chills, dizziness, pain in the calf, and a fever of 102 degrees the prior evening. She also developed a blister on her right calf. After an initial diagnosis of thrombophlebitis, Dr. *855 Geiger received test results on January 5 and 6 that indicated Mrs. Kawaauhau suffered from a bacterial infection. On January 7, he prescribed oral penicillin. After Dr. Geiger left town on January 8, the doctors who assumed care of Mrs. Kawaauhau immediately started her on intramuscular penicillin and arranged to transfer her to a specialist in Honolulu. When Dr. Geiger returned on January 11, he canceled the scheduled transfer because he thought Mrs. Kawaauhau looked stronger and more alert than when he left, and he also canceled all antibiotics because he thought her infection might be gone, she might develop a superinfection, and her blood was too thin. Her condition deteriorated, and on January 14 the decision was made to amputate her leg below the knee.
Based on his own testimony, the bankruptcy court found that Dr. Geiger knew the proper standard of care for treating an infection like Mrs. Kawaauhau’s was intravenous penicillin rather than oral penicillin, and that he knew he was not administering care that met this standard.[1] The court also relied on the expert testimony of Dr. Halford that Dr. Geiger’s intentional substandard care had caused Mrs. Kawaauhau’s infection to progress more rapidly and viciously than it would have otherwise, and that this progression resulted in the amputation of her leg and permanent damage to her kidneys. Dr. Hal-ford expressed the additional opinion that Dr. Geiger had “intentionally administered substandard care to Margaret Kawaauhau that necessarily resulted in advancing infection in her leg, then loss of her leg, and permanent damage to her kidneys.”
The court expresses some uncertainty about the proper procedure in a case such as this and whether the focus should be on the state court pleadings or evaluation of the evidence presented to the state jury. A survey of leading cases indicates that sometimes discharge exception issues are resolved by motions for summary judgment.[2] See, e.g., In re Zelis, 66 F.3d 205, 208 (9th Cir.1995); In re Walker, 48 F.3d 1161, 1163 (11th Cir.1995). Willfulness and maliciousness are typically resolved in a case such as this, however, after a hearing in the bankruptcy court which may involve additional evidence. See e.g., In re Stelluti, 94 F.3d 84 (2d Cir.1996) (bench trial on dischargeability); In re Stanley, 66 F.3d 664 (4th Cir.1995) (bankruptcy court hearing on whether actions leading to state court judgment were willful and malicious under § 523(a)(6)); In re Thirtyacre, 36 F.3d 697 (7th Cir.1994) (evidentiary hearing to determine if actions were willful and malicious); In re Conte, 33 F.3d 303 (3d Cir.1994) (remand for hearing on whether actions underlying state court verdict were willful and malicious under § 523(a)(6)); In re Pasek, 983 F.2d 1524 (10th Cir.1993) (bankruptcy court hearing on willful and malicious); In re Franklin, 615 F.2d 909, 911 (10th Cir.1980) (bankruptcy court not limited to state court record in making dischargeability determination).
The parties here do not challenge the factual findings of the bankruptcy court or the admissibility of the evidence on which it re *856 lied. They view the question for this court to be whether the facts found by the bankruptcy court indicate that the injury caused by Dr. Geiger was willful and malicious and whether the judgments assessed against him for that injury is therefore dischargeable. The factual findings of the bankruptcy court are reviewed for clear error, and its legal conclusions are reviewed de novo. In re Central Arkansas Broadcasting Co., 68 F.3d 213, 214 (8th Cir.1995) (per curiam). I believe a careful review shows that the bankruptcy court’s findings are not clearly erroneous and that they are supported in the record.
The statutory provision controlling the question of discharge in this case, 11 U.S.C. § 523(a)(6), bars discharge in bankruptcy of any debt “for willful and malicious injury by the debtor____” If the intent of Congress is clear from the text of the statute, no further inquiry is necessary. Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 409-11, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993); Arkansas AFL-CIO v. F.C.C., 11 F.3d 1430, 1440 (8th Cir.1993) (en banc). The legislative history is consulted only if that intent cannot be discerned from the plain language. Arkansas AFL-CIO, 11 F.3d at 1440.
The court finds it unnecessary to decide the meaning of “malicious” because of its treatment of “willful.” The statute does not define “willful,” but when Congress uses a term of art, that term is accorded its established meaning. McDermott Int'l Inc. v. Wilander, 498 U.S. 337, 342, 111 S.Ct. 807, 810-11, 112 L.Ed.2d 866 (1991). According to Prosser and Keeton, “[t]he usual meaning assigned to ‘willful’____is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow ...” W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 34, at 213 (5th ed. 1984). Although the meaning of “willful” can be influenced by its context, in civil actions the word is commonly used for an act which is intentional, knowing, or voluntary, as distinguished from accidental. Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945); United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). Only when used in a criminal context does it generally mean an act done with bad purpose. Screws, 325 U.S. at 101, 65 S.Ct. at 1035; Murdock, 290 U.S. at 394, 54 S.Ct. at 225.
The Supreme Court has had only one occasion to discuss the meaning of willful and malicious in the statutory section on exceptions to discharge and that was in Tinker v. Colwell, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904). In Tinker, the Court interpreted “willful and malicious” in this way:
a wilful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done wilfully and maliciously, so as to come within the exception.
Id. at 487, 24 S.Ct. at 509. The Kawaauhaus argue that Tinker is still good law because it has never been overruled or modified by any subsequent Supreme Court case, but Dr. Geiger argues that the legislative history of the new bankruptcy code shows Congress intended in it to override Tinker.
In the bankruptcy code enacted in 1978 Congress made no change in the wording of this exception to discharge, but the more than 700 pages of associated committee reports make brief reference to the meaning of § 523(a)(6). See S.Rep. No. 95-989, at 79 (1978), reprinted in, 1978 U.S.C.C.A.N. 5787, 5865, and H.R.Rep. No. 95-595, at 365 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6320-21. The reports comment:
“[Wjillful” means deliberate or intentional. To the extent that Tinker v. Colwell (citation omitted) held that a [looser (House version); less strict (Senate version) ] standard is intended, and to the extent that other cases have relied on Tinker to apply a “reckless disregard” standard, they are overruled.
Id. This commentary reveals several things, but also raises additional questions. It indicates that “willful means deliberate or intentional” and that § 523(a)(6) calls for something more than reckless disregard. While it indicates some uncertainty as to what Tinker actually held, any reading of it to mean only *857 reckless disregard is overruled. The commentary does not define a heightened standard, however, or how the words intentional and deliberate should be understood.[3]
This legislative history does not call for the interpretation adopted today by the court— that Congress intended “willful” to incorporate subjective specific intent to injure and to restrict the application of § 523(a)(6) to intentional torts. In reaching its conclusion, the court relies on the definition of intent found in the Restatement (Second) of Torts § 8A (1965). The court reads this section to mean that intent can only be shown by proof of the subjective desire to injure or the subjective belief that injury is substantially certain to occur, but comment b notes:
Intent is not ... limited to the consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.
As Judge Becker points out in In re Conte, even if one accepts the Restatement definition as controlling, actions which in an objective sense are substantially certain to cause harm can be considered willful and malicious. 33 F.3d at 307-08.
In reenacting the discharge section of the Bankruptcy Act of 1898 in the code adopted in 1978, Congress used terminology in § 523(a)(6) identical to the language interpreted by the Supreme Court in Tinker. Congress eould have worded the section to require specific intent to injure or an intentional tort if that was its intent, but it did not. The legislative history also does not do either; it does not mention intentional torts or say what is meant by “deliberate or intentional.” Comments in committee reports do not necessarily control meaning, see, e.g., Pierce v. Underwood, 487 U.S. 552, 567-68, 108 S.Ct. 2541, 2551-52, 101 L.Ed.2d 490 (1988),[4] but subsequent to the enactment of the new bankruptcy code courts have tried to conform to the points raised in the legislative history. The variety of formulations which have resulted grow out of the lack of clarity in the committee comments.
No other circuit interprets the statute or the legislative history to require proof of a subjective intent to injure or proof of an intentional tort.[5] The court describes its understanding of the statute as the “natural” meaning, with very little reference to the reasoning and analysis of the circuits which have reached different results. Courts draw varying meanings from the use in § 523(a)(6) of the language construed in Tinker and the legislative history behind it. While several other courts recognize evidence of specific intent to injure as one way to meet the statutory standard, none absolutely require it.
The First, Third, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits all employ a standard that prevents discharge of a debt if the debtor’s act eould be predicted to pro *858 duce the injury suffered by the creditor, but the precise wording of the standard varies. The Sixth Circuit construes willful to apply to an act done intentionally which necessarily produces harm, and malicious to mean wrongful, without just cause or excuse, or excessive. Vulcan Coals, Inc. v. Howard, 946 F.2d 1226, 1228-29 (6th Cir.1991), (citing Perkins v. Scharffe, 817 F.2d 392, 394 (6th Cir.), cert. denied, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987)). Similarly, the Ninth Circuit, reading willful and malicious together, requires an act done intentionally that necessarily produces harm without just cause or excuse. In re Zelis, 66 F.3d at 208. The Third Circuit standard for willful and malicious is an act done intentionally which is “substantially certain to result in injury or where the debtor desired to cause injury.” In re Conte, 33 F.3d at 308. The Eleventh and Fifth Circuits, like the Third, require proof of an intentional act with the purpose to cause injury or one which is substantially certain to cause injury. In re Delaney, 97 F.3d 800, 802 (5th Cir.1996) (per curiam); In re Walker, 48 F.3d at 1165.
Two circuits use somewhat different terminology, but their focus on the foreseeability of the injury is similar to the examination required by other circuits. In the Tenth Circuit, there will be no discharge if the debtor acts “knowing full well that his conduct will cause particularized injury.” In re Pasek, 983 F.2d at 1527. Creditors “are not restricted to direct evidence of specific intent to injure in satisfying the requirements of § 523(a)(6) ... ‘the debtor’s actual knowledge or the reasonable foreseeability that his conduct will result in injury to the creditor’ are highly relevant.” Id. (citations omitted). In the First Circuit, “the term “willful and malicious’ in § 523(a)(6) means an act intentionally committed, without just cause or excuse, in conscious disregard of one’s duty and that necessarily produces an injury.” Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir.1997) (citation omitted).
The standards in the remaining circuits which have ruled on the question vary, but none requires intent to produce the injury. In the Second Circuit the standard requires an intentional and deliberate act which is wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. In re Stelluti, 94 F.3d at 88. In the Fourth Circuit a debtor’s injurious act, done deliberately and intentionally, in knowing disregard of the rights of the other, is sufficiently willful and malicious to prevent discharge, even if a debtor bears a creditor no subjective ill will or specific intent to injure. In re Stanley, 66 F.3d at 667. The Seventh Circuit has concluded that § 523(a)(6) does not require specific intent to injure in order to prevent discharge, but it has not developed a definition beyond that. In re Thirtyacre, 36 F.3d at 701.
The only other circuit to rule on the dischargeability of a medical malpractice debt under § 523(a)(6)[6] declined to discharge the physician’s debt on facts very similar to those in this case. In Perkins the doctor had unnecessarily injected the patient’s foot with an unsterile needle, failed to perform timely tests on the resulting infection, subsequently ignored the belated test results, and failed to hospitalize the patient when hospitalization was necessary. The court, citing the leading bankruptcy treatise, employed the standard of “a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse” and concluded that it was met by the facts. Perkins, 817 F.2d at 394 (citing 3 Collier on Bankruptcy 523-111 (15th ed. 1986)).
Dr. Geiger’s debt should similarly not be discharged. It is not necessary in this case to consider whether the Perkins standard or one of the other circuit definitions of willful and malicious is most appropriate in light of the legislative history and policy because even under In re Long the debt is not subject to discharge.
Until today this court’s construction of the statute, although more restrictive than some, was generally within the range of interpreta *859 tions found in other circuits. Many of our previous cases use a standard for § 528(a)(6) which was articulated in In re Long, 774 F.2d at 881. See In re Waugh, 95 F.3d 706, 711 (8th Cir.1996); In re Miera, 926 F.2d at 743-44. In re Long concluded “willful” meant conduct which was “headstrong and knowing,” and “malicious” meant “targeted at the creditor”, at least in the sense that the injury is certain or almost certain to occur. Id. at 881. Since “intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent.” Id. Although the court cites In re Long in support of its conclusion granting discharge, it actually enunciates a significantly more restrictive standard.[7]
Dr. Geiger’s debt should not be discharged under In re Long because his'admitted administration of substandard care shows an almost certain likelihood of harm resulting from headstrong and knowing acts. The bankruptcy court found that Mrs. Kawaauhau reported to Dr. Geiger complaints of fever and a swollen foot which Was oozing pus. After receiving test results that changed his initial diagnosis from thrombophlebitis to one of infection, Dr. Geiger knew the most effective treatment was intravenous penicillin, and yet he prescribed oral penicillin. He then traveled away and left his patient in the care of other doctors who switched Mrs. Kawaauhau to intramuscular penicillin and Moxam and authorized a transfer to a specialist. When he returned, Dr. Geiger noted that Mrs. Kawaauhau appeared to be doing better after his absence. He chose to terminate her intramuscular treatment, however, to cancel the transfer to a specialist, and to discontinue all antibiotics only four days after starting them. Dr. Geiger admits he knew his care was substandard, and the uncontested expert testimony was that his intentional substandard care harmed Mrs. Kawaauhau. The district court did not err in concluding that the evidence and the findings of the bankruptcy court prevent discharge under In re Long.
Interpreting § 523(a)(6) to require an intentional tort and proof of a specific intent to injure does riot further the policy underlying this section. Section 523(a) makes it clear that Congress did not intend all debts to be forgiven, notwithstanding its general policy of allowing a debtor a “fresh start.” See Miera, 926 F.2d at 745. It intended to relieve honest and unfortunate debtors. In re Molitor, 76 F.3d 218, 220 (8th Cir.1996). The same House report cited by the court notes one purpose of the 1978 amendments was to provide a more effective remedy for the “unfortunate consumer debtor.” H.R.Rep. No. 95-595, at 4, reprinted in 1978 U.S.C.C.A.N. at 5966. Examples given of “unfortunate consumer debtors” include families suffering from a serious illness, unemployment, or aggressive consumer creditors. H.R.Rep. No. 95-595, at 116, reprinted in, 1978 U.S.C.C.A.N. at 6077. While examples listed in a committee report should not be regard as exhaustive, Dr. Geiger can hardly be characterized as an unfortunate consumer debtor. He is a medical doctor who knowingly administered substandard care to his patient. He was found by a jury to have committed malpractice, but he did not carry malpractice insurance. He had no other debts than the malpractice judgment and filed his petition for bankruptcy to avoid payment of that judgment. The unfortunate consumer in this case could easily be seen to be on the opposite side from the debtor.
By enacting the exceptions to discharge, Congress has specified that some debtors may disentitle themselves to relief, but the court’s definition of “willful” is so narrow that it would defeat the purpose of § 523(a)(6) by restricting it to intentional torts or the unusual circumstance where a *860 debtor is “foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor” or to express the belief that injury was substantially certain to follow. In re Conte, 33 F.3d at 308 (citation omitted). Requiring proof of a subjective intent to harm “would undermine the purposes of [§ 523(a)(6) ] and place a nearly impossible burden on a creditor who wishes to show that a debtor intended to do him harm.” In re Conte, 33 F.3d at 308 (citation omitted); see also In re Long, 774 F.2d at 881.
The court has greatly expanded the meaning and significance of the few words in the legislative history and has established a new standard that differs from the practice in the nine other circuits which have examined the section. Seven circuits utilize a definition which includes an intentional act substantially certain to lead to injury or one that would necessarily lead to it.[8] Two circuits use what might be characterized as a knowing disregard standard, and one has ruled only that the statute does not require specific intent. To the extent uniform interpretation of the bankruptcy code is seen as a policy goal, the court today does nothing to further it. See e.g., Perkins, 817 F.2d at 395 (Engel J. concurring).
There is no reason to create a special shield for medical malpractice judgments without a showing that Congress intended to exempt this category of debts from the reach of § 523(a)(6). Just as with other types of debts, the facts of the case must be examined. in order to decide the issue of discharge. Nondiseharge of Dr. Geiger’s debt would not mean that all other malpractice judgment debts could not be discharged.[9] Discharge-ability depends on the facts of the individual ease and whether the proof rises above reckless disregard of the rights of the creditor, whether proven by subjective intent to injure or by objective probability that the injury was necessarily or substantially certain to follow from the intended act.[10]
The findings and record here show conduct that was more than reckless, specifically the knowing administration of substandard care that was substantially certain to cause injury. Absent “a very obvious and exceptional showing of error,” this court is not free to reevaluate the evidence presented in the bankruptcy court. Judge v. Prod. Credit Ass’n of the Midlands, 969 F.2d 699, 700 (8th Cir.1992)(per curiam); see also In re Exec Tech Partners, 107 F.3d 677, 680 (8th Cir.1997).[11] Since Dr. Geiger inflicted a willful and malicious injury within the meaning § 523(a)(6), I would affirm the judgment denying the discharge of his debt to the Kawaauhaus.

. Dr. Geiger testified in the bankruptcy court that his patient’s concern about cost prevented him from administering the proper standard of care. In the state trial, both Mr. and Mrs. Kawaauhau denied they expressed any concern about cost to Dr. Geiger, and this testimony was entered into the bankruptcy court record. Dr. Geiger stated twice at the hearing that he never explained to Mrs. Kawaauhau the cost difference between oral and intravenous penicillin. In response to continued questioning by his attorney, he later stated he did not know if he had discussed the cost difference. The bankruptcy court did not make any specific findings about the conflicting evidence on this point.

. Some motions seek to bar by collateral estoppel the relitigation of factual and legal issues decided in state court. See Grogan v. Garner, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 1, 112 L.Ed.2d 755 (1991) (collateral estoppel may apply to dischargeability proceedings under § 523(a)); In re Miera, 926 F.2d 741, 743 (8th Cir.1991) (willful and malicious issue necessarily decided by state court award of punitive damages).
In this case, unlike Miera, the record does not reveal that the issue of whether Dr. Geiger inflicted a willful and malicious injury was decided in the state court action, and that issue is of course different from the issues of whether Dr. Geiger breached the standard of care he owed Mrs. Kawaauhau or caused her injury, both of which would have been essential to the state judgment. See Restatement (Second) of Torts § 328A (1965 and Supp.1996).

. As the Third Circuit has noted:
While this legislative history excludes recklessness [as a definition of "willful”], it does not state exactly what is required. The bankruptcy courts that have decided this matter have been divided as to whether the statute requires an intentional act that results in injury or an act with intent to cause injury. (Citations and quotations omitted). Moreover, the meaning of either of these two interpretations is not self-evident.
In re Conte, 33 F.3d at 306.

. In Pierce a less restrictive and "naturally conveyed" meaning was adopted rather than one directed by committee comments determined not to be an authoritative expression of the meaning of a phrase. Id. at 565-68, 108 S.Ct. at 2550-52.

. Even when the acts of the debtor could be characterized as intentional torts, other circuits have not required that a debt result from an intentional tort judgement in order to prevent discharge. See, e.g., In re Stelluti, 94 F.3d at 88; In re Stanley, 66 F.3d at 667-68.
The court is not clear about what its requirement of an intentional tort means. If the intent were to restrict § 523(a)(6) to debts resulting from a judgment for an intentional tort, it would add an unprecedented substantive and procedural limitation to this section by requiring parties to obtain a judgment before initiating an adversary proceeding to prevent discharge. If, on the other hand, the court only means to restrict § 523(a)(6) to conduct that can be characterized as intentional torts, it is inviting parties to litigate state tort actions in the bankruptcy court. For example, in this case, the Kawaauhaus could plausibly argue that Dr. Geiger’s actions amounted to battery. See Restatement (Second) of Torts §§ 18-20 (1965).

. The Tenth Circuit has also addressed the dischargeability of a medical malpractice judgment, but that case was applying the "willful and malicious injury” section of the Bankruptcy Act of 1898. See In re Thurman, 901 F.2d 839, 841 (10th Cir.1990) (discussing In re Franklin, 726 F.2d 606 (10th Cir.1984)).

. The court also cites Cassidy v. Minihan, 794 F.2d 340 (8th Cir.1986), which held that an injury caused by a drunk driver was not an intentional injury and therefore the debt was dischargeable. Cassidy considered the legislative history connected with the enactment of the bankruptcy code and determined that “Congress intended to bar the discharge of intentionally inflicted injuries," id. at 344, but it did not consider by what standard such intent would need to be shown and it did not have the benefit of the many other circuit discussions which have issued since 1986.
Subsequent to the events giving rise to Cassidy, Congress amended the statute to bar discharge of debts arising from drunk driving accidents, see 11 U.S.C. § 523(a)(9) (1997), illustrating that Congress can easily amend the statute if it is unhappy with its interpretations.

. Three of these also have an alternative standard similar to the court's requirement of purpose to cause injury, but they do not limit the creditor to this option alone.

. Several other red herrings have also been raised. The court's suggestion that a different result in this case would lead to an interpretation of § 523(a)(6) that would cover even a breach of contract has no support in the record. Neither does the statement at oral argument by counsel for Dr. Geiger that failure to discharge his debt would lead to higher malpractice insurance rates.

. An act that will necessarily lead to harm is the equivalent of one substantially certain to do so because "all effects are probablistic” and it cannot be predicted that a particular result is certain or necessary. In re Conte, 33 F.3d at 308 n. 2.

. Unlike the bankruptcy judge who was the trier of fact, the court believes that Dr. Halford’s expert testimony only shows that Dr. Geiger's treatment resulted in the worsening of Mrs. Kawaauhau's infection, not that it necessarily led to any other injury to her. It bases this distinction on its suspicion that the course of an infection is notoriously difficult to predict. In contrast, the bankruptcy court found that Dr. Geiger's treatment led to the worsening of Mrs. Kawaauhau’s condition and the eventual amputation of her leg. Even if there are two reasonable interpretations of the evidence, this court is required to defer to the bankruptcy court's findings absent clear error. In re LeMaire, 898 F.2d 1346, 1349 (8th Cir.1990).